UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUCIA MARCIANO,

    Plaintiff,

v.

DCH AUTO GROUP, BRIAN LAM, and
BERNARD FEE

    Defendants.

Civil Action No. 11-CV-9635 (KMK)
ECF Case

**DECLARATION OF GENE
HALLENBECK IN SUPPORT OF
DEFENDANTS' MOTION TO COMPEL
ARBTIRATION PURSUANT TO THE
FEDERAL ARBITRATION ACT, 9 U.S.C. §
1 et seq. AND TO DISMISS PLAINTIFF'S
COMPLAINT**

       Gene Hallenbeck, pursuant to 28 U.S.C. § 1746(2), under penalty of perjury, hereby declares as follows:

       1.    I am the Vice President of Human Resources for DCH Pace BMW and as such, I am fully familiar with the facts contained herein.

       2.    This Certification is made in support of Defendants' Motion to Compel Arbitration Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. to Dismiss Plaintiff's Complaint.

       3.    On or about January 10, 2009, Lucia Marciano signed an Arbitration Agreement with DCH Pace BMW as part of her Application for Employment. A true and accurate copy of Plaintiff's employment application and arbitration agreement entitled "Acknowledgment and Authorization" is attached hereto as Exhibit A.

       4.    The Arbitration Agreement signed by Ms. Marciano requires that she must bring any claims stemming from her employment with DCH's automobile dealerships, including DCH Pace BMW, to binding arbitration.

5.     The Arbitration Agreement specifically encompasses the claims alleged by Ms. Marciano contained in her Complaint.

6.     The "Acknowledgment and Authorization" contained in Ms. Marciano's Application for Employment is standard for all DCH dealership's in New York, including DCH Pace BMW.

7.     On April 16, 2013, in violation of the agreement to arbitrate, Ms. Marciano filed her Third Amended Complaint against Defendants DCH Auto Group, Brian Lam and Bernard Fee. A true and accurate copy of the Third Amended Complaint filed with the Court on April 16, 2013 is attached hereto as Exhibit B.

8.     On April 23, 2013, April 26, 2013 and May 3, 2013, Bernard Fee, Brian Lam and DCH Auto Group were served with copies of the Third Amended Complaint, respectively. True and accurate copies of the Affidavits of Service for Bernard Fee, Brian Lam and DCH Auto Group filed with the Court on May 3, 2013 and May 13, 2013 are collectively attached hereto as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

_____
GENE HALLENBECK

Executed: 6/27, 2013
South Amboy, New Jersey

# Exhibit A

# Application For Employment—NY

_Pace BMW_
(The Company)

## An Equal Opportunity Employer

The Company considers all applicants without regard to age, race, religion, color, gender, national origin, marital status, sexual orientation, or any other characteristics recognized by Federal, State, or Local law. No question in this application is intended to secure information for the purpose of discrimination. Proof of identity and work authorization will be required upon employment in accordance with federal regulations. The Company intends to check and hold you responsible for the accuracy of the statements you make on this application. This application will receive active consideration for ninety (90) days. If you have not heard from the Company within this time period and wish to receive further consideration for employment, it will be necessary to complete another application form.

## Applicant Data

Name _Lucia Marciano_ Date _1/10/09_

Social Security Number _____ Are you 18 years or older? _Yes_

Address _1027 Palmer Ave._

City _Larchmont_ State _NY_ Zip _10538_

Length of Time at This Address _25 yo_ Telephone Number _(914) 841-0586_

Position(s) Applied For _Sales_

Can you perform the essential functions of the position you are applying for with or without an accommodation? _Yes_

Pay level desired _____

Have you ever applied here before? ☐ Yes ☒ No
If so, when? _____

Have you ever been employed at this dealership? ☐ Yes ☒ No
If yes, give date and location _____

Have you ever been employed by a DCH Auto ☐ Yes ☒ No
Group Affiliate?
If yes, date and location _____

Are you employed now? ☒ Yes ☐ No
If so, may we contact your present employer? Yes ☒ No

Are you available to work any shift, any day of the week? ☒ Yes ☐ No
If not, what days and times are you available _____

Have you ever been convicted of a felony? ☐ Yes ☒ No
If yes, give details _____

Application for Employment—NY (03/2003)

# Employment History

Please list all work experience beginning with your most recent employer first.

**1**

| Employer Mercedes Benz Greenwich | Dates Employed | | Work Performed |
|---|---|---|---|
| Address 261 Putnam Ave. | From: 2001 | To: Present | Developed new bus. utilizing |
| City/State Greenwich, CT | | | internet. Originated built |
| Job Title Int. Mgr. / New Bus. Rev | Hourly Rates/Salary | | and established lucrative |
| Supervisor Emel Dilek | Starting: | Final: | client relationships |
| Telephone Number (203) 869-2850 | | | |
| Reason for Leaving : | | | |

**2**

| Employer White Plains Mercedes Benz Larchmont | Dates Employed | | Work Performed |
|---|---|---|---|
| Address 50 Bank St. | From: 2005 | To: 06 | Developed new bus. |
| City/State White Plain, NY | | | internet, lease and outside |
| Job Title New Bus. Development | Hourly Rates/Salary | | showroom. |
| Supervisor John Silva | Starting: | Final: | |
| Telephone Number (914) 428-9000 | | | |
| Reason for Leaving | | | |

**3**

| Employer Lexus | Dates Employed | | Work Performed |
|---|---|---|---|
| Address Boston Post Rd. | From: 2003 | To: 04 | Identified clients needs |
| City/State Larchmont | | | and coordinated team |
| Job Title Sales Assistant | Hourly Rates/Salary | | |
| Supervisor | Starting: | Final: | |
| Telephone Number (  ) | | | |
| Reason for Leaving | | | |

**4**

| Employer KPMG Peat Marwick | Dates Employed | | Work Performed |
|---|---|---|---|
| Address Park Ave. | From: 1997 | To: 2002 | Prep. + analyzed Forecast |
| City/State NYC, NY | | | reports pers. develop. proposals |
| Job Title Resource analyst Fin. consulting | Hourly Rates/Salary | | effectively negotiated |
| Supervisor Charmaine Woolcock | Starting: | Final: | contracts. |
| Telephone Number (  ) | | | |
| Reason for Leaving | | | |

# Education

|  | High School | College University | Graduate Professional |
|---|---|---|---|
| School Name | Mamaroneck High | Iona College |  |
| Highest Year Completed | 9 10 11 (12) | 1 2 3 (4) | 1 2 3 4 |
| Diploma/Degree |  | BBA Accounting |  |
| Course of Study |  | Accounting |  |

Describe specialized school projects or extra-curricular activities:

# Skills

Please list any special technical or other qualifications that you feel would enhance your employment

ADP CRM, Hitcher Gear, Momentum, Revolution
Microsoft Outlook, Excel, Word

# References

Please list three references who are not relatives or former employers.

| Name | Occupation | Years Known | Phone/Address |
|---|---|---|---|
| Carla Darling | Sales | 4 | (914) 954-0581 |
| Lisa Firmin | Sales | 30 | (203) 209-0274 |
| Leo Piskic | Sales | 6 | (203) 517-6482 |

# Relatives in Our Employment

| Name | Relationship | Name | Relationship |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

# Acknowledgement and Authorization

I acknowledge that the Company utilizes a system of alternative dispute resolution which involves binding arbitration to resolve all disputes which may arise out of the employment context. I agree to the terms of this Agreement because of the mutual benefits (such as reduced expense and increased efficiency) which private binding arbitration can provide both the Company and myself. I and the Company both agree that any claim, dispute, and/or controversy (including but not limited to any claims of employment discrimination, harassment, and/or retaliation under Title VII and all other applicable federal, state, or local statute, regulation or common law doctrine) which would otherwise require or allow resort to any court or other governmental dispute resolution forum between myself and the Company (and/or its subsidiaries, affiliates, owners, directors, officers, managers, employees, agents, and parties affiliated with its employee benefit and health plans) arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, or other association with the Company, whether based on tort, contract, statutory, or equitable law, or otherwise, (with the sole exception of claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under the New York Workers' Compensation Act) shall be submitted to and determined exclusively by binding arbitration. I agree that the arbitration and this Agreement shall be controlled by the Federal Arbitration Act. Any dispute shall be submitted for resolution to an impartial arbitrator selected under the Rules of the American Arbitration Association, whose decision shall be final and binding and subject to confirmation in a court of competent jurisdiction. In the event that the Arbitrator determines that a breach has occurred, he or she shall issue an appropriate award. I understand that I can pursue all of my substantive rights and remedies in arbitration, including attorneys' fee awards. **I UNDERSTAND BY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH I AND THE COMPANY GIVE UP OUR RIGHTS TO TRIAL BY JURY. I FURTHER UNDERSTAND THAT THIS BINDING ARBITRATION AGREEMENT IS A CONTRACT. HOWEVER, IT DOES NOT CONSTITUTE A CONTRACT OF EMPLOYMENT AS IT DOES NOT COVER ANY OTHER TERMS AND CONDITIONS OF MY EMPLOYMENT.**

The Company will initially pay for any and all filing fees associated with the arbitration. The Company agrees not to seek any costs, filing fees, or its attorneys' fees, but rather will bear these costs regardless of the outcome of the arbitration.

I hereby understand that prior to binding arbitration, the parties may agree to submit to a non-binding mediation process before an impartial mediator chosen jointly by the parties. I further understand that the non-binding mediation process is a completely voluntary step prior to arbitration, and that either party may forego with mediation and move directly to arbitration. I understand that I cannot waive my agreement to binding arbitration with the Company under any circumstance.

I hereby state that all the information that I provided on this application or any other documents filled out in connection with my employment, and in any interview is true and correct. I have withheld nothing that would, if disclosed, affect this application unfavorably. I understand that if I am employed and any such information is later found to be false or incomplete in any respect, I may be dismissed. **If hired, I agree as follows: My employment and compensation are terminable at-will, are for no definite period, and my employment and compensation may be terminated by the Company at any time and for any reason whatsoever, with or without good cause at the option of either the Company or myself. Consequently, all terms and conditions of my employment, with the exception of the arbitration agreement, may be changed or withdrawn at the**

Application for Employment—NY (03/2003)

## Acknowledgement and Authorization

Company's unrestricted option at any time, with or without good cause. No implied, oral or written agreements contrary to the express language of this agreement are valid unless they are in writing and signed by the President of the Company. No supervisor or representative of the Company, other than the President of the Company, has any authority to make any agreements contrary to the foregoing. This agreement is the entire agreement between the Company and the employee, and takes the place of all prior agreements, representations, and understandings of the employee and the Company.

Should any term or provision, or portion thereof, be declared void or unenforceable, it shall be severed and the remainder of this agreement shall be enforced.

*If you have any questions regarding this statement, please ask a Company representative before signing. I hereby acknowledge that I have read the above statements and understand the same.*

DO NOT SIGN THIS UNTIL YOU HAVE READ THE ABOVE STATEMENT & AGREEMENT

_____*Lucia Marciano*_____          _____1/10/09_____
SIGNATURE OF APPLICANT                              DATE

### Please continue to Back Page

# Acknowledgement and Authorization

In the event of my employment to a position at this Company, I will comply with all rules and regulations of this Company. I understand that the Company reserves the right to require me to submit to a test for the presence of drugs in my system prior to employment and at any time during my employment, to the extent permitted by law. I also understand that any offer of employment may be contingent upon the passing of a physical examination and a test for the presence of alcohol in my system, performed by a doctor selected by the Company. Further, I understand that at any time after I am hired, the Company may require me to submit to a physical examination and an alcohol test, to the extent permitted by law. I consent to the disclosures of the results of physical examinations and related tests to the Company. I also understand that I may be required to take other tests such as personality and honesty tests, prior to employment and during my employment. I understand that should I decline to sign this consent or decline to take any of the above tests, my application for employment may be rejected or my employment may be terminated. I understand that bonding may be a condition of hire. If it is, I will be so advised either before or after hiring and a bond application will have to be completed.

I understand that (in connection with this application and at any time during my employment) the Company may investigate my driving record, credit record and my criminal record. I further understand that the Company may contact my previous employers and I authorize those employers to disclose to the Company all records and information pertinent to my employment with them. In addition to authorizing the release of any information regarding my employment, I hereby fully waive any rights or claims I have against my former employers, their agents, employees and representatives, as well as other individuals who release information to the Company and release them from any and all liability, claims, or damages that may directly or indirectly result from the use, disclosure, or release of any such information by any person or party, whether such information is favorable or unfavorable to me. I authorize the persons named herein as personal references to provide the Company with any pertinent information they may have regarding myself.

I hereby state that all the information that I have provided on this application or any other documents filled out in connection with my employment, and in any interview is true and correct. I have withheld nothing that would, if disclosed, affect this application unfavorably. I understand that if I am employed and any such information is later found to be false in any respect, I may be dismissed. I understand that if selected for hire, it will be necessary for me to provide satisfactory evidence of my identity and legal authority to work in the United States, and the Federal immigration laws require me to complete an I-9 Form in this regard.

If hired, I understand and agree that MY EMPLOYMENT WITH THE COMPANY IS TERMINABLE "AT-WILL", IS FOR NO DEFINITE PERIOD, AND MAY BE TERMINATED BY EITHER MYSELF, OR BY THE COMPANY AT ITS OPTION AT ANY TIME, FOR ANY REASON WHATSOEVER, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE. Consequently, all terms and conditions of my employment may be changed or withdrawn at the Company's unrestricted option at any time, with or without good cause. No implied, oral or written agreements to the contrary are valid unless they are in writing signed by the President of the Company. No supervisor or representative of the Company, other than the President of the Company, has any authority to make any agreements contrary to the foregoing.

If you have any questions regarding this agreement, please ask a Company representative before signing.

DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE STATEMENT

_____        _1_/_10_/_09____
Signature of Applicant                              Date

Application for Employment—NY (03/2003)

# Exhibit

# B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)
--------------------------------------------------------X
LUCIA MARCIANO,

                Plaintiff,

          -against-

DCH AUTO GROUP, BRIAN LAM, and
BERNARD FEE,

                Defendants.
--------------------------------------------------------X

No. 11 Civ. 9635 (KMK)

THIRD AMENDED
COMPLAINT

      Plaintiff, LUCIA MARCIANO, by and through her attorneys, Beranbaum

Menken LLP, complaining of Defendants DCH AUTO GROUP, BRIAN LAM, and

BERNARD FEE, alleges:

## NATURE OF ACTION

      1.      This action is brought to remedy claims of sex and disability

discrimination, sexual harassment and unlawful retaliation pursuant to Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act

of 1991, 42 U.S.C. § 1981A ("Title VII"); the American with Disabilities Act, 42 U.S.C.

§ 12101 et seq. ("ADA"), as amended by the ADA Amendments Act of 2008

("ADAAA"); and the New York State Human Rights Law, Executive Law §§ 290 *et seq.*,

(the "Human Rights Law" or "SHRL").

      2.      Plaintiff seeks injunctive and declaratory relief, compensatory and

punitive damages, statutory penalties, attorneys' fees, and all other appropriate relief

pursuant to federal and state law.

JURISDICTION AND VENUE

3.      On or about May 26, 2010, plaintiff filed a timely charge of discrimination
with the Equal Employment Opportunity Commission ("EEOC"), complaining of the
unlawful discriminatory and retaliatory acts alleged herein, and obtained a Notice of
Right to Sue, dated October 4, 2011, less than 90 days from the filing of the Complaint,
originally filed on December 27, 2011, and a second Notice of Right to Sue dated March
28, 2013.

4.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331
(federal question) and 1343 (civil rights), and 42 U.S.C. § 2000e-5(f)(3). This Court also
has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §
1367.

5.      As Defendant DCH Auto Group has offices in and regularly does business
within the State of New York, and because the circumstances giving rise to this action
occurred within the Southern District of New York, venue is proper in this District
pursuant to 28 U.S.C. 28 U.S.C.§ 1391(b) and (c) and 42 U.S.C. § 2000e-5(f)(3).

PARTIES

7.      Plaintiff Lucia Marciano ("plaintiff" or "Marciano") is a female currently
residing in Westchester County in the State of New York who was employed by
defendants in the State of New York. Plaintiff was an "employee" of defendant DCH
Auto Group as that term is defined under the Title VII, 42 U.S.C. § 2000e(f); the ADA,
42 U.S.C. § 12111(4) and the NYSHRL, § 292(6). As of July 24, 2009 plaintiff was a
"qualified individual with a disability" as that term is defined by the ADA, 42 U.S.C. §
12111(8), and the NYSHRL, § 292(6).

2

8.     Defendant DCH Auto Group ("DCH") is a corporation organized under the laws of the State of Delaware that owns and operates new and used car dealerships in New York, New Jersey, Connecticut and California, including the dealership where plaintiff worked – DCH Pace BMW in Mamaroneck, New York. On information and belief, DCH maintains its principal office and corporate headquarters at 955 Route 9 North, South Amboy, New Jersey, 08879. DCH was plaintiff's employer within the meaning of Title VII, 42 U.S.C. § 2000e(b); the ADA, 42 U.S.C. § 12111(5)(A) and the NYSHRL § 292(5).

9.     Individual defendant Brian Lam ("Lam") is and was, at all times relevant to this suit, the son of DCH's owner and Chairman, Shau-wai Lam, and has served as the General Manager of DCH's Pace BMW dealership in Mamaroneck, New York and DCH's Paramus Honda dealership in Paramus, New Jersey. Individual defendant Bernard Fee ("Fee") is and was, at all times relevant to this suit, the Sales Manager of the DCH dealership where plaintiff worked – DCH Pace BMW Mamaroneck, in Mamaroneck, New York, and plaintiff's immediate supervisor. At all times relevant to this suit, Lam and Fee had the power and authority to hire, fire and discipline employees of DCH; were plaintiff's employers within the meaning of the NYSHRL § 292(5); aided in and abetted the sexual harassment, disability discrimination and retaliation committed against Plaintiff; and regularly worked, and made decisions concerning the hiring, firing and discipline of employees, in the State of New York.

## STATEMENT OF FACTS

10.     Plaintiff began working for defendants at the DCH Pace BMW dealership in Mamaroneck, New York ("Pace BMW") on February 23, 2009, after interviewing with

3

defendants Lam and Fee. Lam and Fee offered plaintiff the job of "Internet Manager," and promised her an annual salary of $150,000.

11.    In reliance on promises made to her by Lam and Fee regarding her compensation, plaintiff left her prior employment at Mercedes-Benz to work at Pace BMW.

12.    Plaintiff was not provided with a written job description when she started working, but was instructed to perform the same duties as she had been performing in her previous job at Mercedes-Benz. Her job duties included, *inter alia*, working on the internet, communicating with customers and making appointments.

13.    During the period from February 23, 2009 to approximately March 14, 2009, defendants paid plaintiff $500 per week. Defendants told plaintiff that this pay arrangement would be temporary, pending the set-up of her formal "Pay Plan" for the annual salary of $150,000 promised her during her initial interview.

14.    On March 14, 2009, three weeks after plaintiff started working at the Pace BMW dealership, defendants left a "Pay Plan" on her desk with instructions for her to sign it. The compensation set forth in the "Pay Plan" was for $500 per week plus commissions, far less than the $150,000 plaintiff had been promised.

15.    When plaintiff complained about the discrepancy between the pay she had been initially promised and the much lower amount that defendants were seeking to pay her, defendants Lam and Fee threatened not to pay her at all if she refused to sign the "Pay Plan."

16.    When plaintiff began working at Pace BMW new car dealership, she was the only female employee working there.

4

17.     From the very first day of her employment, plaintiff suffered discrimination on the basis of her sex: she was excluded from professional opportunities; she was subjected to inappropriate stereotypical characterizations and impersonations; she was subjected to derogatory, offensive and humiliating comments; her complaints and concerns were generally ignored; and her work was unfairly scrutinized. The discriminatory treatment plaintiff suffered because of her sex included but was not limited to the following:

a.   When plaintiff first began working, defendant Fee asked her to keep her job title a secret from the men in the office, because he did not want other men in the office to know that the position previously held by a male employee, Gunn Park ("Park") had been eliminated, and that a woman had been hired in a managerial position higher than that which Park had held.

b.   In meetings, Lam and Fee encouraged men to sit in the seats closest to them, and reserved seats at meetings only for the male employees.

c.   On one occasion, in plaintiff's presence, Lam referred to a female to whom he sold a car above retail price as a "stupid woman."

d.   Defendants failed to provide plaintiff with business cards and supplies even after she made repeated requests, while the men at the dealership were provided the same promptly.

e.   When she complained about defendants' reducing her pay, defendant Lam remarked, "We should not have hired a woman."

f.   When plaintiff asked Lam and Fee for training opportunities to sell vehicles on her own (and to make full commissions on sales), her request

was denied. The reason she was given was that "customers can't get over on men the way they can get over on women."

g. On several occasions, defendant Fee accused plaintiff of not knowing how to take the license plates off of cars, and humiliated her about it in front of the salesmen. When plaintiff tried to explain that she did, in fact, know how to remove license plates, Fee told her that "a woman can't do a man's job."

h. For some time, construction was being performed in the area of plaintiff's workspace, causing her to be exposed to construction dust and debris, continuous loud drilling and banging noise, and glue and paint fumes and odors. When plaintiff asked to be relocated to a vacant workstation in the front of the dealership, defendants Lam and Fee refused her request, informing her that having a woman in front of the dealership would "infringe upon sales opportunities for the men."

i. When the construction work was slowing down, defendant Fee instructed plaintiff to clean up the construction dust and debris "because that is a woman's job." Fee further went so far to humiliate plaintiff as to order her into the cleaning supply closet with him, pointing out the vacuum and custodial supplies, and telling plaintiff "everything you need to help you clean you can find in this closet." While plaintiff was vacuuming up the construction dust and debris, as ordered, Fee watched her and remarked that she was not "sucking up enough."

j.  In a meeting on March 25, 2009, Lam and Fee told plaintiff that if she were to ask for and/or receive assistance from the salesman in any way, money would be deducted from her paychecks and given to the salesmen who helped her. On information and belief, the dealership did not have a practice of deducting money from male employees' paychecks under similar circumstances. When plaintiff complained, Lam and Fee told her that "the men are friends with each other and do favors for each other," and that "it pays to have the men as friends."

k.  During the March 25, 2009 meeting, Lam and Fee denied plaintiff the commissions to which she was entitled on several deals by removing her name from the deals and redistributing her commission to the salesmen. Lam and Fee also wrongfully gave several of plaintiff's internet customers to the salesmen, along with the entire commissions on those deals.

l.  During the March 25, 2009 meeting, Lam and Fee told plaintiff she was expected to drive long distances on highways and bridges to pick up cars. When plaintiff told them she was uncomfortable driving long distances and that she had not been told that doing so was a job requirement at the time she accepted the Internet Manager position, Lam and Fee decided to withhold half of her sales commissions to give to the person sent to pick up cars. Fee also ridiculed plaintiff, telling her that "men all know how to drive long distances, why are women so incompetent?" .

m.  Once, when plaintiff reacted with discomfort to a statement Fee made to her, Fee responded by telling her, "don't frown, because frowning makes

7

lines on your forehead and men know women are only concerned about their looks."

n. On another occasion, male manager Kevin Chang ("Chang"), spilled milk out of the refrigerator in the break area and shouted at plaintiff to clean it up, telling her, "that's a woman's job."

o. Plaintiff frequently overheard Fee referring to women as "pigs" in the presence of other male employees

p. Defendant Fee repeatedly called plaintiff a "stupid woman," often in the presence of other male employees.

q. On April 18, 2009, plaintiff went to defendant Fee to ask him where the customer's car manual was located. Fee responded in a hostile manner, ordering plaintiff to follow him to Lam's workspace, where he pulled the manual out of Lam's desk and waived it in front of plaintiff's face, shouting, "This is a manual!" Fee then ordered plaintiff into an office and closed the door behind them, where he continued to harass and humiliate her, calling her a "stupid woman."

r. Plaintiff complained to Fee about his calling her "stupid" and asked that he stop disrespecting and harassing her because she was a woman. Plaintiff also reminded Fee that she had a college diploma, to which Fee responded by continuing to harass her and saying that "education does not matter, because I can hang a diploma on a pig, the same as giving a diploma to a woman!" Fee then forced plaintiff to answer the question

"Why do women have no common sense?" before allowing her to leave the office.

s.   On April 18, 2009, upon seeing Plaintiff exiting the office in an emotionally distressed state, another female employee who worked for DCH in its pre-owned dealership (in a different building than plaintiff) confided in plaintiff that she too had been the victim of harassment and gender discrimination, by DCH Management and feared retaliation were she to complain. She told plaintiff that her boss, Kevin Chang, harassed her the worst.

t.   On April 20, 2009, defendant Fee acknowledged having treated plaintiff poorly, attributing his behavior to ongoing personal issues with his wife and indicating that he believed it was appropriate to vent his frustrations on plaintiff because she was also a woman.

u.   Despite plaintiff's complaints about automotive fumes, management often left vehicles idling unnecessarily in the vicinity of plaintiff's open workstation.

v.   Management frequently scrutinized plaintiff's behavior in a way that it did not scrutinize that of male employees, for example, by following her around, listening in on her conversations, threatening disciplinary action were she to inadvertently fail to punch in or out or for taking breaks, and by threatening to deduct from her pay the time when she had to step outside of the showroom for short periods of time to get away from automotive fumes.

18.     Plaintiff complained about the above described conduct repeatedly to defendants Lam and Fee, but nothing was done to address her concerns. Rather, defendants' conduct continued to get worse.

19.     When plaintiff made a specific complaint about the April 18, 2009 incident (see subparagraphs "q," "r" and "s" above, Lam immediately retaliated by, on the very same day, giving her the time consuming and ultimately futile task of contacting a long list of inactive customers not currently in the car market to set up sales appointments.

20.     On April 20, 2009, plaintiff made another verbal complaint to Lam regarding the April 20, 2009 incident with Fee (see subparagraph "t" above).

21.     On April 20, 2009, plaintiff also made a verbal complaint to Joe Solano ("Solano"), the Regional Manager of DCH Auto Group and Carrie Ferrantino ("Ferrantino"), the Human Resources Manager of DCH Auto Group, regarding the April 18, 2009 and April 20, 2009 incidents (see subparagraphs "q" through "t" above).

22.     On April 24, 2009, plaintiff made written complaints to Lam, Solano and Ferrantino about the hostile and discriminatory work environment to which she was being subjected, and the retaliatory conduct she had experienced as a result of her verbal complaints.

23.     On May 8, 2009, twenty days after she made her complaints to management, plaintiff received a letter from Ferrantino acknowledging receipt of her written complaints and promising to investigate the matter promptly and thoroughly.

24.     On May 14, 2009, plaintiff met with Ferrantino in person, and reiterated her complaints. Ferrantino downplayed and defended Fee's actions, and blamed

plaintiff's lack of training for the April 18, 2009 incident with the customer car manual.
Ferrantino also told plaintiff that she needed to be "more tolerant."

25.    . On information and belief, no investigation was done into plaintiff's
complaints, other than interviewing plaintiff herself. No remedial action was taken.

26.    After the May 14, 2009 meeting, defendants took no action to address or
remedy plaintiff's complaints of discrimination and harassment, and plaintiff continued
to be subjected to hostile and discriminatory behavior from Lam, Fee, Chang and other
male employees at the dealership. That hostile and discriminatory behavior included but
was not limited to the following:

> a. In or around May 2009, a male sales employee, Peter Rowicki,
> approached plaintiff and told her that he had witnessed management
> ganging up against her and treating her poorly, and that he was
> ashamed of their behavior and of his own hostile treatment of her.
> Rowicki also told plaintiff that he himself had treated her poorly so
> that he could better fit in with the other male employees and gain favor
> with management. Plaintiff reported her conversation with Rowicki to
> Lam, and Rowicki was fired shortly thereafter.

> b. In late May or June 2009, another male sales employee, Neil Lampert
> ("Lampert") approached plaintiff to tell her that management was
> disbursing her internet leads to other salesmen, who in turn were
> making commissions to which plaintiff was rightfully entitled.
> Lampert told plaintiff that he himself did not feel comfortable taking
> her leads, and that he would return her customers to her.

11

c.  In late May or June 2009, plaintiff complained to Lam, Fee, Solano
and Ferrantino about the improper distribution of her leads, but no
remedial action was taken. Instead, Solano came to the dealership, and
called plaintiff into an office where Fee was already waiting. Solano
told plaintiff in an angry and hostile manner, in Fee's presence, that
Fee was permitted to do whatever he wanted with plaintiff's internet
leads. Solano ordered plaintiff not to complain again, and threatened to
terminate her employment if she did. Solano also instructed Fee to
continue distributing plaintiff's leads to other salesmen, but to exclude
Lampert from the distribution. Solano further told plaintiff that she
would not receive the compensation (of $150,000 annually) that she
had initially been promised, and would never get a promotion. Solano
told her that he had heard that plaintiff had been doing a "great job,"
and indicated that she would have received her promised
compensation but for her complaints.

d.  On several occasions when plaintiff asked Chang for cooperation in
working with her, he responded in a hostile manner and threw keys at
her.

27.     On May 21, 2009, Ferrantino sent plaintiff a letter requesting that she sign
a statement that read "...despite your earlier communications, you now have no concerns
about Bernard Fee, you are still working with Bernard [Fee], but you temporarily report
to Brian Lam, General Sales Manager, no further issues or concerns have arisen, you are
comfortable working with Bernard [Fee] and you have no complaints about the work

12

environment at Pace BMW." Plaintiff refused to sign the letter, as it contained false statements.

28.     Plaintiff continued to complain to Lam, Fee, Ferrantino and Solano about the hostile work environment and retaliatory actions being taken against her. Still, nothing was done to investigate or remedy her complaints.

29.     On July 24, 2009, plaintiff was diagnosed with breast cancer.

30.     On that same day, plaintiff informed Fee and Lam of her diagnosis and requested a medical leave of absence for the following week. Fee informed plaintiff that her request for one week of leave – from July 27, 2009 through August 3, 2009 – had been approved.  Plaintiff then followed up by providing defendants with a note from her oncologist explaining that she would be attending medical appointments that week.

31.     While plaintiff was out on leave, Ferrantino called her repeatedly and harassed her. In telephone calls on July 28th and July 29th, Ferrantino told plaintiff, in a threatening tone, that DCH was going to terminate her employment and her health insurance coverage. In telephone calls on July 30th and July 31st, Ferrantino made inappropriate requests for confidential medical information, demanding that plaintiff tell her if her oncologist was recommending chemotherapy, and if so, when chemotherapy treatments were expected to start, how long they were expected to last, the names of her doctors, a schedule of her doctors' appointments, and to specifically identify the names of all medical tests and procedures she was expected to undergo.

32.     On August 3, 2009, plaintiff's treating oncologist, Dr. Beverly Drucker ("Dr. Drucker"), sent DCH a letter stating that plaintiff needed to be absent for several

days for doctor's appointments, and identifying plaintiff's doctors, tests, and treatments in response to Ferrantino's requests for such medical information.

33.   On August 6, 2009, Dr. Drucker sent DCH a letter by facsimile stating that plaintiff had started chemotherapy that day, and that her return to work date was not determinable at that time.

34.   Nonetheless, Ferrantino continued to contact plaintiff at home, in a series of harassing telephone calls.

35.   On the evening of August 6, 2009, after receiving Dr. Drucker's letter stating that plaintiff "received her first chemotherapy today," Ferrantino called plaintiff at home and in a hostile tone, again threatened to terminate plaintiff's employment and health insurance coverage. Plaintiff told Ferrantino that she was seeking the reasonable accommodation of a flexible work schedule, to permit her to leave work to attend chemotherapy treatments and other medical appointments. Ferrantino told plaintiff that, based on her complaints of gender discrimination, it was unlikely that DCH would provide her with accommodations for her disability. Ferrantino later confirmed that Lam had in fact refused to accommodate plaintiff to work at the dealership or to work from home, and that his decision was final.

36.   Also on August 6, 2009, Ferrantino sent plaintiff a letter informing her that she did not qualify for leave pursuant to the Family and Medical Leave Act ("FMLA"), and that DCH would grant her a discretionary (emphasis in original) leave of absence for a maximum of 20 working days, and noting that renewal or extension of that leave was not available.

14

37.     On August 12, 2009, Ferrantino told plaintiff that she had until August 23, 2009 to return to work, and that if she did not return to work by that date, her employment and her health insurance coverage would be terminated effective August 24, 2009. Ferrantino told plaintiff she had the option to reapply for consideration of employment at a later date if she was no longer disabled and needing accommodations.

38.     On August 13, 2009, Dr. Drucker sent DCH a letter reiterating that plaintiff was undergoing chemotherapy treatment for breast cancer, and would be unable to return to work until further notice. Dr. Drucker specified in that same letter that any questions related to plaintiff's medical condition "can be directed to this office."

39.     In spite of Drucker's directive, Ferrantino called plaintiff again on August 18, 2009. Ferrantino told plaintiff that DCH had no obligation to provide her with a discretionary leave of absence, and threatened that she was counting down the days until DCH was going to terminate her employment and her health insurance.

40.     On August 19, 2009, Ferrantino sent plaintiff a letter falsely accusing plaintiff of having failed to provide a doctor's note to substantiate her need for leave.

41.     On August 24, 2009, Dr. Drucker submitted another letter to DCH requesting that DCH accommodate plaintiff's disability by allowing her to work part-time in a desk only position, with flexible hours and the ability to leave work when she was not feeling well and for medical appointments.

42.     Without making any attempt to discuss plaintiff's requests for accommodation, Ferrantino told plaintiff on August 26, 2009 that DCH was refusing to provide the accommodations requested in Dr. Drucker's August 24, 2009 letter.

43.    On August 27, 2009, without having made any attempt to engage plaintiff in the interactive process, DCH sent a letter to plaintiff saying that it had determined that she was "not currently qualified to perform the essential functions of [her] job," and requesting additional medical information from her doctor.

44.    On or around August 28, 2009, after refusing to provide reasonable accommodation for plaintiff to return to work, Ferrantino told plaintiff that she was ineligible for enrollment in DCH's Voluntary Short Term Disability Benefits. Ferrantino also wrongly informed plaintiff that she was not eligible to claim New York State Disability Benefits, effectively preventing plaintiff from applying. Plaintiff relied on Ferrantino's misrepresentations to her detriment, and was denied her employee entitlement to claim both DCH's Voluntary Short Term Disability Benefits and New York State Disability Benefits.

45.    On September 1, 2009, Ferrantino again contacted plaintiff and questioned her inappropriately regarding the type of chemotherapy being administered to her, the side effects of the treatments, and how many treatments plaintiff had yet to receive. Plaintiff did her best to answer Ferrantino's questions without Dr. Drucker's input – Dr. Drucker was on vacation at the time – but told Ferrantino she would respond more fully to the questions when Dr. Drucker returned.

46.    On September 2, 2009, DCH sent plaintiff another letter saying that it had determined she was "not currently qualified to perform the essential functions of [her] job," and requesting additional information regarding her medical condition from her doctor.

47.     On September 10, 2009, Dr. Drucker submitted another letter to DCH on plaintiff's behalf, stating that plaintiff was scheduled for chemotherapy treatments on the 17th and 18th of September, with additional treatment to follow. Dr. Drucker also wrote that plaintiff's condition, side effects and necessary work accommodations could only be determined after treatment had been administered.

48.     On September 17, 2009, Ferrantino wrote plaintiff again, acknowledging receipt of Dr. Drucker's September 10, 2009 letter stating that plaintiff's treatment was expected to last through October 2, 2009, and that she would need additional time thereafter to recuperate. Ferrantino also requested that plaintiff provide additional medical certification if her leave were to extend beyond October 12, 2009, and a specific date when she could return to work.

49.     On or around October 14, 2009, plaintiff contacted Ferrantino by telephone to discuss her treatment regimen.

50.     On October 15, 2009, DCH sent plaintiff again acknowledging receipt of Dr. Drucker's September 10, 2009 letter, and also acknowledging Ferrrantino's October 14, 2009 conversation with plaintiff, both of which referred to plaintiff's ongoing treatment and need for time off to recuperate. Nonetheless, Ferrantino reprimanded plaintiff for not returning to work by October 12, 2009. DCH also asked plaintiff to provide, by October 22, 2009 a doctor's note outlining her treatment schedule and limitations, as well as a definite date for her return to work.

51.     On October 22, 2009, Dr. Drucker responded to Ferrantino's request for additional medical information, and provided Ferrantino with plaintiff's upcoming chemotherapy treatment schedule. Dr. Drucker also stated that the accommodations

17

plaintiff required were the same as those detailed in prior correspondence – i.e., that plaintiff be allowed to work part-time in a desk only position, with flexible hours and the ability to leave work when she was not feeling well and for medical appointments.

52.     On or around November 16, 2009, plaintiff informed Ferrantino that she would undergo breast cancer surgery in December and would require a medical leave of absence, the exact dates of which she could not yet determine because exact date of the surgery had not yet been determined. Ferrantino falsely accused plaintiff of requesting an indefinite leave of absence.

53.     On November 17, 2009, Ferrantino wrote plaintiff again, falsely stating that plaintiff was "still requesting an indefinite leave of absence," and asking plaintiff, again, when she would be able to return to work, disregarding plaintiff's earlier statement that the date of her surgery, and required medical leave thereafter, was not yet determinable.

54.     On December 3, 2009, plaintiff's surgeon – Dr. Barbara Ward ("Dr. Ward"), under whose care plaintiff would be for at least the two to three week period following her surgery, subject to reexamination – provided DCH with a letter requesting leave for surgery.

55.     On December 4, 2009, plaintiff had breast cancer surgery.

56.     On information and belief, on or around December 14, 2009, just days after plaintiff's surgery, Ferrantino contacted Dr. Ward without plaintiff's knowledge or consent, and tried to pressure Dr. Ward to authorize plaintiff to return to work by December 28, 2009. Dr. Ward informed Ferrantino that Dr. Drucker, plaintiff's

18

oncologist, would need to be consulted regarding plaintiff's return to work date and what accommodations she would require.

57.     On December 15, 2009, Ferrantino sent plaintiff a letter falsely claiming that Dr. Ward did not object to her returning to work on December 28, 2009.

58.     On January 7, 2010, while plaintiff was recovering from surgery, Dr. Drucker sent a letter to Ferrantino requesting various reasonable accommodations that would permit her to return to work by February 1, 2009, including a part time desk only position and time off for her scheduled physical therapy sessions and doctor's appointments.

59.     In response, on January 13, 2010, Ferrantino wrote Dr. Drucker, requesting that she fill out an attached "Fitness for Duty" form for plaintiff and identify any activities that plaintiff was unable to perform. The form mistakenly identified plaintiff's position as "Employee's Sales Advisor." The form also incorrectly identified standing and walking for long periods, and bending in and out cars as being "essential functions," even though such activities were not essential to plaintiff's actual position as Internet Manager.

60.     On February 2, 2010, Dr. Drucker responded to Ferrantino that the Fitness for Duty form could not be completed because it related to a different job title the job title of "Sales Advisor," and not plaintiff's actual position of "Internet Manager." Dr. Drucker further stated that plaintiff was able to perform all the functions of her actual, desk-only position, and requested that DCH, as a reasonable accommodation to her medical condition, allow her to assume her desk-only position on a part time flexible schedule, with time off for physical therapy and medical appointments.

61.     On February 3, 2010, plaintiff wrote to Ferrantino that she had tried to call

Ferrantino several times to discuss her requested accommodations but had not received a

call back. Plaintiff also complained, again, about the inaccuracies in the Fitness for Duty

form that DCH had sent to Dr. Drucker, and that Ferrantino had contacted her surgeon

without her knowledge or consent.

62.     On February 4, 2010, DCH wrote to plaintiff, acknowledging receipt of

Dr. Drucker's February 2, 2010 letter requesting that DCH accommodate plaintiff by

allowing her to resume her desk-only position on a part-time, flexible schedule, with time

off for medical appointments. Rather than engaging with plaintiff in an interactive

dialogue regarding her requested accommodations, DCH stated bluntly: "you will work

as an Internet Manager (desk-only) part time position [sic]. Your hours will be working

9am to 2pm, Monday through Friday." DCH failed to address plaintiff's requests for a

flexible schedule or time off for medical appointments.

63.     On February 5, 2010, in a telephone conversation, Ferrantino threatened

plaintiff that her employment would be terminated if she were to take time off for

medical appointments, because she had no accrued time off. Ferrantino also informed

plaintiff that DCH was terminating her health insurance and all other employee benefits

upon her return to work part-time. Ferrantino again refused to discuss plaintiff's

accommodation needs with her during this telephone call. Ferrantino also reminded

plaintiff that Solano (Regional Manager) was unhappy about her prior complaints of

gender discrimination, and that he did not want to hear any further complaints from her

about DCH's failure to provide her the accommodation of time off for medical

appointments, reiterating that plaintiff was expected to be present at her desk from

9:00a.m. to 2:00p.m. Monday through Friday (25 hours per week), and advising plaintiff that she should see her doctors on weekends, on her own time.

64.    In the same February 5, 2010 telephone conversation, plaintiff informed Ferrantino that she had an oncology appointment on February 8, 2010, the day DCH wanted her to return to work. Ferrantino reminded plaintiff that she had no accrued time off, and threatened plaintiff with termination should she take time off for medical appointments. Ferrantino ordered plaintiff to cancel her February 8, 2010 appointment, but plaintiff refused to do so.

65.    Plaintiff attended her oncology appointment on February 8, 2010, and saw Dr. Barry Boyd ("Dr. Boyd"), another member of her oncology team. On that same date, Dr. Boyd wrote to DCH advising that plaintiff had had surgery and chemotherapy, that he was advising plaintiff not to return to work at that time, and that plaintiff would need to be reevaluated in two weeks time to determine whether she was well enough to return to work. Boyd also instructed DCH to contact him with any further questions.

66.    Between the dates of approximately February 8, 2010 and March 24, 2010, plaintiff made numerous attempts to reach Ferrantino by telephone to discuss her return to work with reasonable accommodation. Ferrantino failed to return plaintiff's calls, and hung up on plaintiff when plaintiff did manage to get her on the phone.

67.    Plaintiff complained to DCH Human Resources representative Xiomel Santos ("Santos") about Ferrantino's unresponsiveness, and requested his assistance with her return to work.

21

68.     On March 25, 2010, Ferrantino finally contacted plaintiff. Ferrantino told plaintiff that she would send a letter outlining specific requirements for her return to work.

69.     On April 8, 2010, plaintiff received a letter from Ferrantino, with a Fitness for Duty Certificate attached, which again incorrectly listed her job title as "Employee Sales Advisor," and incorrectly listed various physical duties as "essential" to the position that were not essential to plaintiff's actual position of Internet Manager, such as standing and walking for long periods and bending in and out of cars.

70.     In a letter dated April 12, 2010, Dr. Drucker wrote to DCH that plaintiff could return to work on April 19, 2010 and that plaintiff was able to perform all functions of her desk only position as Internet Manager. Dr. Drucker also requested accommodations for plaintiff, including: maintaining her desk only Internet Manager position; working 30 hours per week; a flexible schedule, including time off for medical appointments; a 10:00am start time, to allow plaintiff to attend physical therapy and/or other rehabilitation programs; a day off in the middle of the week – Thursday instead of Saturday – to allow her to rest and to coincide with the availability of her doctors, who were not available on weekends.

71.     In a letter dated April 14, 2010, Dr. Drucker wrote to DCH that plaintiff could return to work on May 3, 2010 and that plaintiff was able to perform all functions of her desk-only position as Internet Manager. Dr. Drucker also requested accommodations for plaintiff, including: maintaining her desk only Internet Manager position; working 30 hours per week; a flexible schedule, including time off for medical appointments; a 10:00am start time, to allow plaintiff to attend physical therapy and/or

22

other rehabilitation programs; a day off in the middle of the week – Thursday instead of Saturday – to allow her to rest and to coincide with the availability of her doctors, who were not available on weekends, in order to help her maintain her schedule hours and "a workplace where she will not be exposed to harmful gas and exhaust fumes from starting and/or idling vehicles indoors."

72.    On April 16, 2010, after acknowledging receipt of Dr. Drucker's April 14, 2010 letter requesting accommodations for Plaintiff to return to work, Ferrantino wrote plaintiff and Dr. Drucker asking for extensive additional information regarding her requested accommodations, including a schedule of plaintiff's treatments and "further clarification" of plaintiff's request not be exposed to harmful fumes. Ferrantino requested that Dr. Drucker again fill out the Fitness for Duty form that incorrectly identified certain physical activities of the Sales Advisor position nonessential to plaintiff's Internet Manager position.

73.    On or around April 30, 2010, Dr. Drucker filled out and returned the Fitness for Duty form, stating that plaintiff was able to perform all essential functions of her job with the reasonable accommodations listed in her April 14, 2010 letter.

74.    On May 3, 2010, DCH acknowledged receipt of the Fitness for Duty form faxed from Dr. Drucker, stating that Plaintiff was able to perform all the essential functions of her job with the reasonable accommodations she requested on April 14, 2010 and again attached to the Fitness for Duty form. DCH sought receipt of Dr. Drucker's April 14, 2010 letter again, and requested that the same Fitness for Duty form be completed again by Dr. Drucker. Again, DCH sought a "treatment schedule" for Plaintiff, even though Plaintiff was not undergoing treatment.

75.     On May 7, 2010, plaintiff provided DCH with further clarification regarding her request for accommodation. Plaintiff again requested the following accommodations: a flexible work schedule, including a 30 hour week and a 10:00a.m. start time, that she be permitted to make telephone calls to her doctors during work hours; a workplace where she would not be exposed to gas and exhaust fumes from starting and/or idling vehicles indoors, and specifically identifying glass enclosed workstations that were available at the dealership; and an ergonomic chair/workstation to help alleviate painful, awkward postures and decrease fatigue.

76.     In addition to her letter, plaintiff made multiple attempts to contact Ferrantino by telephone to discuss her requests for accommodation, and left voicemail messages for Ferrantino on April 29th, April 30th, May 3rd, May 4th, May 7th and May 10th. Ferrantino did not return any of plaintiff's messages, and refused to engage with plaintiff in any kind of dialogue regarding her requested accommodations.

77.     On May 10, 2010, plaintiff sent a letter to DCH complaining about Ferrantino's failure to respond to her telephone calls and failure to engage with plaintiff in any type of interactive process regarding accommodation of her disability. Plaintiff also provided extensive additional written information regarding her accommodation requests.

78.     On May 11, 2010, presumably in response to plaintiff's written complaint, Ferrantino contacted plaintiff to set up a meeting on May 13, 2010.

79.     Plaintiff met with Ferrantino on May 13, 2010. Another woman who plaintiff did not know – May Ann Lamourt ("Lamourt") – was also present.

80.   At the May 13, 2010 meeting, plaintiff explained to Ferrantino and Lamourt the essential functions of her Internet Manager position were working on the internet, communicating with customers by email and over the phone; making appointments for customers to come in to the dealership; and delegating appointments to sales people in converting appointments to sales. Plaintiff also explained that she could perform all of those essential functions with the limited accommodations she had requested – a flexible work schedule, time off if needed for medical appointments, and office where she would not be exposed to harmful fumes, and an ergonomic chair – and that none of her requested accommodations would impose hardship on DCH.

81.   Ferrantino and Lamourt responded in a hostile and aggressive manner to plaintiff's requests for accommodation: they repeatedly interrupted her; refused to let her talk; ridiculed her statements; used abusive language; ordered her to provide "yes" or "no" answers to their questions; and repeatedly raised her unrelated prior complaints of gender discrimination, harassment and retaliation. Ultimately, Ferrantino and Lamourt refused to provide *any* requested accommodations, and told plaintiff not to return to work.

82.   Between May 13, 2010 and May 20, 2010, no one from DCH contacted plaintiff to discuss her requested accommodations.

83.   On May 20, 2010 and on May 26, 2010, plaintiff sent letters to Ferrantino complaining about Ferrantino's and Lamourt's hostile treatment of her during the May 13, 2010 meeting and DCH's failure to accommodate her or engage her in the interactive process. Ferrantino did not respond.

84.    On May 24, 2010, plaintiff sent the same letter to Lam, complaining about the May 13, 2010 meeting and DCH's failure to accommodate her or engage her in the interactive process, and reiterating her requests for accommodation.

85.    On May 24, 2010, despite plaintiff's extensive communications with DCH regarding her requested accommodations and her treating oncologist's completed Fitness for Duty Certificate stating plaintiff was able to perform the essential functions of her job with the requested accommodation, Ferrantino wrote to plaintiff claiming that plaintiff had still not provided necessary clarification regarding her requested accommodations, and instructing her that DCH was requiring her to undergo an examination by an independent medical examiner ("IME"), and that the IME would complete the Fitness for Duty Certificate based on examining plaintiff for her ability to perform the nonessential functions as incorrectly listed on the Fitness for Duty Certificate form, before she could return to work. The letter – and accompanying documentation – stated that as an interim accommodation (while awaiting the IME), plaintiff would be permitted to work from home at a pay rate of $7.25 per hour, the minimum wage, and maintain a schedule of 30 hours per week. As such, DCH was effectively reducing plaintiff's weekly rate of pay to $217.50, a reduction of over 50% from what she had been making prior to her diagnosis, and of over 90% from the $150,000.00 annual salary she was initially promised.

86.    On May 26, 2010, plaintiff sent a letter to DCH stating that she could not agree with DCH's offer to return her to work at a fraction of her former salary, as set forth in its May 24, 2010 letter and accompanying documentation, and the examination DCH requested she undergo for the IME to complete the incorrect Fitness for Duty form misrepresenting the essential functions of her Internet Manager position to include the

nonessential functions of standing and walking for long periods and bending in an out of cars, as plaintiff believed the offer to be discriminatory and retaliatory.

87.    In May 2010, plaintiff filed a charge of discrimination and retaliation with the EEOC.

88.    On or around May 26, 2010, on information and belief immediately after receiving notice of plaintiff's EEOC filing, DCH prohibited plaintiff from all verbal communications with the company. Thereafter, plaintiff's communications with DCH were only in writing, through DCH Auto Group Vice President, Gene Hallenbeck ("Hallenbeck").

89.    In a letter on dated June 1, 2010, DCH Auto Group Vice President, Hallenbeck responded to plaintiff's complaints about the May 13, 2010 meeting with Ferrantino and Lamourt by defending DCH's conduct and refusing to take further action. Hallenback once again requested a completed Fitness for Duty form from plaintiff, claiming that her previous accommodation requests, and the Fitness for Duty form her treating Oncologist, Dr. Drucker had completed, were inadequate. Hallenback also attached a "Schedule" listing "Essential Functions of the 'Internet Manager' Position," which again incorrectly included the ability to perform physical activities, including standing and walking for long periods and bending in and out of cars. Hallenbeck's letter ignored the fact that plaintiff's doctors had authorized her to return to work, with accommodation, as of April 14, 2010, and ignored plaintiff's ongoing complaints that those physical activities as listed on the Fitness for Duty form for the Sales Advisor position included activities that were not essential to her position as Internet Manager.

90.    In a letter dated June 3, 2010, plaintiff responded to Hallenbeck's June 1,

2010 letter, reiterating her requests for accommodation, and making detailed complaints

that DCH's wrongful handling of her accommodation requests and failure to engage her

in the interactive process was discriminatory and retaliatory. Plaintiff also stated, again,

that she was willing, ready and able to return to work and could perform all essential

functions of her Internet Manager job with reasonable accommodation, in accordance

with Dr. Drucker's April 12th and April 14th letters.

91.    Hallenbeck responded by letter on June 7, 2010, still questioning whether

Plaintiff was medically able to safely perform what he referred to as the "essential

functions" of her job. On information and belief, Hallenbeck was referring to, and

seeking information about, the "essential functions" of the Employee's Sales Advisor

position, which included standing and walking for long periods and bending in and out of

cars -- activities which were nonessential to plaintiff's Internet Manager position.

Hallenbeck outlined the requested accommodations that he claimed the company was

willing to provide, including a 30 hour work week, a 10:00am start time, unpaid breaks

during the work day, and Thursdays off -- however, plaintiff had all of these things before

she went out on leave, and as such, DCH's offer to provide them was not an offer of

reasonable accommodation. Hallenbeck also requested additional information about the

requested accommodations of an ergonomic chair, and mischaracterized plaintiff's

request for any one of the existing several offices available at the dealership as a request

for "seclusion." Hallenbeck completely failed to address any of plaintiff's other requested

accommodations, such as a flexible schedule, time off for medical appointments, and

redistribution of nonessential functions to other employees to help with fatigue.

92.    In his June 7, 2010 letter, Hallenbeck misrepresented plaintiff's request for an enclosed office (so as not to be exposed to harmful fumes) to be a request for "seclusion." Plaintiff had never, in fact, requested the accommodation of "seclusion."

93.    On June 17, 2010, plaintiff sent Hallenbeck a letter stating, that her doctor had cleared her to return to work with accommodation. Plaintiff also complained that DCH's alleged concerns with her "safety" were unfounded, that DCH was making the process of requesting accommodation unnecessarily time consuming and difficult, and that she continued to believe DCH's conduct was discriminatory and retaliatory.

94.    On June 18, 2010, Hallenbeck sent plaintiff a letter stating that plaintiff would temporarily be permitted to work from home 30 hours per week at a reduced salary.

95.    Thereafter, DCH continued to refuse to have any verbal contact with plaintiff, did nothing to accommodate plaintiff's disability, and did nothing to implement their suggestion that she temporarily work from home.

96.    On July 7, 2010, plaintiff wrote to DCH, stating, once again, that she was ready and able to return to work, and had been cleared to return to work as per Dr. Drucker's letters of April 12, 2010 and April 14, 2010, and that neither she nor her doctor had ever requested the accommodation of working from home. Nonetheless, as DCH had provided her with no other option, plaintiff stated that she would be willing to work from home as long as her compensation was not reduced and she was provided with her requested accommodations.

97.    In a letter dated July 19, 2010, Hallenbeck, on information and belief referring to the essential functions that appeared on the Fitness for Duty Certificate form

29

for the Employee's Sales Advisor position and not plaintiff's actual Internet Manager position, stated that the functions of her job could not be done in a work at home environment, and that as such, the suggestion that she work from home (which was not an actual accommodation of her disability) was only being offered to "allow [her] to maintain [her] job functionality until [she was] able to return to the dealership in [her] full capacity as Internet Manager."

98.     In a series of letters thereafter, Hallenbeck continued to refer only to, and request information about, his suggestion plaintiff work from home, which was not a reasonable accommodation for her disability. Neither DCH nor Hallenbeck took any steps to actually implement the suggestion that she work from home, and did not offer or even discuss with plaintiff any reasonable accommodation for her disability.

99.     On July 27, 2010, Dr. Drucker cleared plaintiff to return to work at 40 hours per week. DCH failed to respond.

100.    On August 10, 2010, plaintiff sent Hallenbeck a six-page letter detailing the office and other supplies that she would need in order to be able to work from home, the only option DCH had left her with. Plaintiff attached Dr. Drucker's July 27, 2010 letter clearing her to return to work 40 hours per week.

101.    On August 25, 2010, in spite of the voluminous documentation plaintiff had already provided regarding her need for accommodation, Hallenbeck sent plaintiff a letter requesting that she provide "a written proposal outlining the specifics of [her] requested accommodations." The only "accommodations" he listed, however, were office supplies that would be needed for a home office, and were not actually accommodations plaintiff had requested for her disability. Hallenbeck indicated that his response to her

August 10, 2010 letter was "preliminary," and that a more complete response was to follow. Hallenbeck failed to respond to or acknowledge Dr. Drucker's July 27, 2010 letter clearing her to return to work 40 hours per week.

102. On August 28, 2010, plaintiff requested the "complete response" that Hallenbeck had promised in his August 25, 2010 letter. None was provided.

103. On September 16, 2010, Hallenbeck wrote to plaintiff and again failed to address the accommodations she had requested for her disability or any other concerns raised in her prior correspondence and once again failed to acknowledge or respond to Dr. Drucker's July 27, 2010 letter clearing plaintiff to return to work at 40 hours per week. Instead, Hallenbeck requested even more specific information regarding the only option DCH was claiming to make available – the "home office setup." Hallenbeck asked for minute details regarding plaintiff's home that he claimed were necessary for the "home office setup," stating the following:

> As one example, we do not know the size of your intended home office space, or the size of the windows in that room. Thus, we would not know the size and BTU's needed for an air conditioner unit for that room, and without that information we do not know the cost of same. Similarly, regarding the shades for your home office, we do not know how many windows there are, the types of windows, the size of windows, the type of shades the home office space needs, the cost of same, and so on. Another example relates to your request for an ergonomic chair; in order to avoid further misunderstandings or controversies, we'd like to know which ergonomic chair suits your specific needs and the cost of same.

Hallenback failed to address any of the accommodations plaintiff had requested for her disability or any of the concerns raised in her previous correspondence.

104. Also on September 22, 2010, Dr. Drucker provided a letter to DCH stating that plaintiff continued to have sleep problems and related fatigue, and still needed accommodations at the workplace. DCH failed to respond.

31

105.    On October 5, 2010, plaintiff responded to the September 22, 2010 letter, stating that she believed that DCH, in stating that its only aim was for her to work from home and not provide her any reasonable accommodation for her disability, was segregating her from all other employees because she had made complaints and filed an EEOC charge. Plaintiff also stated that she believed that DCH, by refusing to engage in a dialogue with her regarding the accommodations that were for her disability, was not acting in good faith. Plaintiff reiterated that she was ready and able to return to work with accommodation. DCH failed to respond.

106.    On February 15, 2011, having received no response from DCH to her October 5, 2010 letter or prior correspondence from Dr. Drucker, plaintiff contacted DCH's lawyer, Dena Calo ("Calo") to ask why DCH had not contacted her regarding her requested accommodations. Calo instructed plaintiff to continue communicating with Hallenbeck, and stated that it was her understanding that plaintiff had communicated directly with Hallenbeck before filing her EEOC charge. In fact, plaintiff had had no communications with Hallenbeck prior to filing her Charge, and thereafter, had communicated with Hallenbeck only in writing, based on the restrictions DCH placed on her. Calo provided no further information or assistance.

107.    On February 16, 2011, plaintiff sent an email and a letter to Hallenbeck complaining that DCH had failed to respond to her October 5, 2010 letter and prior correspondence from Dr. Drucker or otherwise engage her in interactive communications regarding her need for accommodation, while continuing to bar her from returning to work.

32

108.    On February 16, 2011, Hallenbeck sent plaintiff a letter saying that DCH

wanted her to be examined by an IME to address restrictions "as a result of [plaintiff's]

surgery performed in December 2009 and treatment [plaintiff] underwent thereafter."

This statement was false and exaggerated the alleged need for an IME, as plaintiff had

not in fact undergone treatment after her surgery. In the same letter, Hallenbeck requested

plaintiff's written authorization to provide the IME with certain selected medical

documentation related to her condition. Conspicuously absent from the documentation

Hallenbeck had selected to send to the IME were highly relevant letters from her doctors

regarding her condition, such as Dr. Drucker's letter of July 27, 2010, clearing plaintiff to

return to work at 40 hours per week and Dr. Drucker's letter of September 22, 2010,

stating that plaintiff was having ongoing sleep problems and related fatigue, and

continued to need accommodations at the workplace.

109.    DCH failed to provide an IME, and as such, plaintiff was never examined

by an IME.

110.    In a letter dated, February 21, 2011, Hallenbeck wrote to plaintiff

regarding the part-time, work-from-home position – the only option she had been given -

disregarding that plaintiff had been released to work full time by her oncologist, Dr.

Drucker, months earlier.

111.    On February 24, 2011, plaintiff sent a letter to DCH stating that she was

still willing and able to provide any assistance and/or medical information necessary for

DCH to consider her accommodation requests. DCH again failed to respond.

112.    DCH discriminated and retaliated against plaintiff by, *inter alia*,

prohibiting plaintiff from any verbal communications with the company regarding her

33

need for accommodation; failing to provide meaningful responses to plaintiff's repeated requests for accommodation; failing to respond to correspondence from plaintiff's treating oncologist; failing to provide any accommodations for her disability; repeatedly requesting that she undergo an IME examination, on information and belief to determine whether she could perform activities nonessential to the functions of her actual job, and for "seclusion" – not an accommodation she had requested – based on unfounded safety concerns regarding plaintiff's disability; requesting minute details about her home, claiming they were necessary for a home office set up, which was not a reasonable accommodation for plaintiff's disability; and failing to provide any possible reasonable accommodation for plaintiff's disability, even though Plaintiff's request for accommodations posed no hardship and she was able to perform the essential functions of her job with reasonable accommodations.

113.    Over a month later, on March 30, 2011, DCH sent plaintiff a letter, signed by Solano, stating that her employment was terminated effective immediately and without warning.

<u>FIRST CAUSE OF ACTION: TITLE VII</u>

114.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

115.    In violation of Title VII, defendants discriminated against plaintiff on the basis of her gender by, *inter alia*: treating her less favorably than similarly situated male counterparts in terms of salary, benefits and other terms and conditions of employment; subjecting her to a higher level of scrutiny than her male counterparts; subjecting her to stricter discipline than her male counterparts for comparable infractions; and denying her

34

resources and opportunities for advancement that were provided to her male counterparts. Defendants also violated Title VII by subjecting plaintiff to a sexually hostile work environment, *inter alia*, by subjecting plaintiff to inappropriate stereotypical characterizations and impersonations and subjecting her to derogatory, offensive and humiliating comments. Defendants further violated Title VII by retaliating against plaintiff when she complained about the discrimination and harassment, by, *inter alia*, threatening to terminate her employment because of her complaints; refusing to investigate or take any steps to remedy her complaints; subjecting her to increasingly harsh scrutiny; and denying her resources and opportunities for advancement.

116.    In taking the above described discriminatory actions, defendants acted with malice and reckless indifference to plaintiff's rights under Title VII.

117.    Plaintiff has lost wages, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer with severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of defendants' discriminatory practices.

<u>SECOND CAUSE OF ACTION: ADA</u>

118.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

119.    Defendants violated the ADA by refusing to accommodate plaintiff's known disability, refusing to engage her in the interactive process, and retaliating against her for requesting accommodation and for filing an EEOC charge of discrimination in a series of acts culminating in the termination of her employment in March, 2012. Defendants also failed to engage plaintiff in the interactive process required by the ADA.

35

120.   As a direct and proximate result of defendants' unlawful and discriminatory conduct in violation of the ADA, plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits.

121.   As a direct and proximate result of defendants' unlawful and discriminatory conduct in violation of the ADA, plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

122.   Defendants' unlawful discriminatory actions constitute willful violations of the ADA for which plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION: NYSHRL

123.   Plaintiff repeats and realleges each and every allegation contained this Complaint with the same force and effect as if fully set forth herein.

124.   Defendants violated the sex discrimination protections of the NYSHRL by: treating her less favorably than similarly situated male counterparts in terms of salary, benefits and other terms and conditions of employment; subjecting her to a higher level of scrutiny than her male counterparts; subjecting her to stricter discipline than her male counterparts for comparable infractions; and denying her resources and opportunities for advancement that were provided to her male counterparts. Defendants also violated the NYHSRL by subjecting plaintiff to a sexually hostile work environment, *inter alia*, by subjecting plaintiff to inappropriate stereotypical characterizations and impersonations and subjecting her to derogatory, offensive and humiliating comments.

125.    Defendants violated the disability discrimination protections of the NYSHRL by refusing to accommodate plaintiff's known disability and refusing to engage her in the interactive process.

126.    Defendants further violated NYHRL by retaliating against plaintiff when she complained about the discrimination and harassment, by, *inter alia*, threatening to terminate her employment because of her complaints; refusing to investigate or take any steps to remedy her complaints; subjecting her to increasingly harsh scrutiny; and denying her resources and opportunities for advancement.

127.    As a direct and proximate result of defendants' unlawful and discriminatory conduct in violation of the NYHRL, plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits.

128.    As a direct and proximate result of defendants' unlawful and discriminatory conduct in violation of the ADA, plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.    Declaring the acts and practices complaint of herein to be violations of the Title VII, the ADA and the NYSHRL;

b.    Enjoining and permanently restraining these violations of law;

37

c.    Directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

d    Directing defendants to place plaintiff in the position she would have occupied but for defendants' unlawful conduct, and making her whole for all earnings and other benefits he would have received but for defendants' unlawful conduct, including but not limited to wages, bonuses, other lost benefits, loss of good will, and interest thereon;

e.    Directing defendants to pay plaintiff front pay, to compensate her for all monetary and/or economic damages, including but not limited to the loss of past and future income, wages, compensation, seniority and other benefits of employment;

f.    Directing defendants to pay plaintiff compensatory damages, including damages for her mental anguish, denial of life's pleasures, pain and suffering and humiliation; liquidated damages; punitive damages and interest thereon;

g.    Directing defendants to pay plaintiff an award of punitive damages;

h.    Awarding plaintiff the costs of this action together with reasonable attorney fees; and

i.    Granting such other relief as this Court deems necessary and proper.

# Exhibit

# C

UNITED STATES DISTRICT COURT/SOUTHERN DISTRICT OF NEW YORK   Attorney: BERANBAUM MENKEN LLP.

LUCIA MARCIANO

|  | Plaintiff(s) | Index # 11 CIV. 9635 (KMK) |

- against -

DCH AUTO GROUP, ETAL

|  | Defendant(s) | **AFFIDAVIT OF SERVICE** |

STATE OF NEW YORK: COUNTY OF NEW YORK  ss:

JEFF CAMPOLO BEING DULY SWORN DEPOSES AND SAYS DEPONENT IS NOT A PARTY TO THIS ACTION, OVER THE AGE OF EIGHTEEN YEARS AND RESIDES IN THE STATE OF NEW YORK.

That on April 23, 2013 at 10:46 AM at

C/O MERCEDES-BENZ OF NEW ROCHELLE
77 EAST MAIN STREET
NEW ROCHELE, NY 10801

deponent served the within SUMMONS AND COMPLAINT FOR EMPLOYMENT DISCRIMINATION; AMENDED COMPLAINT FOR EMPLOYEE DISCRIMINATION; SECOND AMENDED COMPLAINT;* on BERNARD FEE therein named,

**SUITABLE AGE**    by delivering thereat a true copy of each to LINDA SAO a person of suitable age and discretion. Said premises is Defendant's actual place of business within the state. She identified herself as the CO-WORKER of the Defendant.

Deponent further states that he describes the person actually served as follows:

| Sex | Skin Color | Hair Color | Age (Approx.) | Height (Approx.) | Weight (Approx) |
|---|---|---|---|---|---|
| FEMALE | BROWN | RED | 28 | 5'6 | 120 |

**MAILING**    Deponent enclosed a copy of same in a postpaid wrapper properly addressed to the Defendant at the Defendant's actual place of business at

C/O MERCEDES-BENZ OF NEW ROCHELLE
77 EAST MAIN STREET
NEW ROCHELE, NY 10801

and deposited said wrapper in a post office or official depository under exclusive care and custody of the United States Postal Service within New York State on April 30, 2013 by REGULAR FIRST CLASS MAIL in an envelope marked PERSONAL & CONFIDENTIAL and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served.

PERSON SPOKEN TO REFUSED TO STATE TRUE FIRST AND/OR LAST NAMES

**MILITARY SERVICE**    Person spoken to was asked whether the Defendant was in the military service of the State of New York or the United States and received a negative reply. Upon information and belief based upon the conversation and observation as aforesaid deponent avers that the Defendant is not in the military service of the State of New York or the United States as that term is defined in the statutes of the State of New York or the Federal Soldiers and Sailors Civil Relief Act.

*THIRD AMENDED COMPLAINT

That at the time of such service deponent knew the person so served as aforesaid to be the same person mentioned and described as the Defendant in this action.

Sworn to me on: April 30, 2013

| | | | |
|---|---|---|---|
| RALPH MULLEN | JOSEPH KNIGHT | JONATHAN GRABER | **JEFF CAMPOLO** |
| Notary Public, State of New York | Notary Public, State of New York | Notary Public, State of New York | |
| No. 01MU6238632 | No. 01KN6178241 | No. 01GR6156760 | |
| Qualified in New York County | Qualified in New York County | Qualified in New York County | |
| Expires April 11, 2015 | Expires November 26, 2015 | Expires December 4, 2014 | Invoice #: 575723 |

UNITED PROCESS SERVICE, INC., 3RD FLOOR, 315 BROADWAY, NEW YORK, NY 10007 - (212) 619-0728

Case 7:11-cv-09635-KMK   Document 26   Filed 05/03/13   Page 1 of 1
UNITED STATES DISTRICT COURT/SOUTHERN DISTRICT OF NEW YORK   Attorney:  BERANBAUM MENKEN LLP.

LUCIA MARCIANO

Plaintiff(s)

Index # 11 CIV. 9635 (KMK)

- against -

DCH AUTO GROUP, ETAL

Defendant(s)

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK: COUNTY OF NEW YORK  ss:

DAN KNIGHT BEING DULY SWORN DEPOSES AND SAYS DEPONENT IS NOT A PARTY TO THIS ACTION, OVER THE AGE OF EIGHTEEN YEARS AND RESIDES IN THE STATE OF NEW YORK.

That on April 26, 2013 at 02:03 PM at

C/O DCH PARAMUS HONDA
120 NEW JERSEY 4
PARAMUS, NJ 07652

deponent served the within SUMMONS AND COMPLAINT FOR EMPLOYMENT DISCRIMINATION; AMENDED COMPLAINT FOR EMPLOYEE DISCRIMINATION; SECOND AMENDED COMPLAINT;* on BRIAN LAM therein named,

**SUITABLE AGE**   by delivering thereat a true copy of each to EDWIN TORRES a person of suitable age and discretion. Said premises is Defendant's actual place of business within the state. He identified himself as the CO-WORKER of the Defendant.

Deponent further states that he describes the person actually served as follows:

| Sex | Skin Color | Hair Color | Age (Approx.) | Height (Approx.) | Weight (Approx) |
|------|-----------|-----------|--------------|-----------------|-----------------|
| MALE | BROWN | BLACK | 46 | 5'8 | 180 |

**MAILING**   Deponent enclosed a copy of same in a postpaid wrapper properly addressed to the Defendant at the Defendant's actual place of business at

C/O DCH PARAMUS HONDA
120 NEW JERSEY 4
PARAMUS, NJ 07652

and deposited said wrapper in a post office or official depository under exclusive care and custody of the United States Postal Service within New York State on April 30, 2013 by REGULAR FIRST CLASS MAIL in an envelope marked PERSONAL & CONFIDENTIAL and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served.

**MILITARY SERVICE**   Person spoken to was asked whether the Defendant was in the military service of the State of New York or the United States and received a negative reply. Upon information and belief based upon the conversation and observation as aforesaid deponent avers that the Defendant is not in the military service of the State of New York or the United States as that term is defined in the statutes of the State of New York or the Federal Soldiers and Sailors Civil Relief Act.

*THIRD AMENDED COMPLAINT

That at the time of such service deponent knew the person so served as aforesaid to be the same person mentioned and described as the Defendant in this action.

Sworn to me on: April 30, 2013

RALPH MOLLEN
Notary Public, State of New York
No. 01MU6238632
Qualified in New York County
Expires April 11, 2015

JOSEPH KNIGHT
Notary Public, State of New York
No. 01KN6178241
Qualified in New York County
Expires November 28, 2015

JONATHAN GRABER
Notary Public, State of New York
No. 01GR6156780
Qualified in New York County
Expires December 4, 2014

DAN KNIGHT

Invoice #: 575724

UNITED PROCESS SERVICE, INC., 3RD FLOOR, 315 BROADWAY, NEW YORK, NY 10007 - (212) 619-0728

UNITED STATES DISTRICT COURT/SOUTHERN DISTRICT OF NEW YORK   Attorney: BERANBAUM MENKEN LLP.

---

LUCIA MARCIANO

Plaintiff(s)

- against -

Index # 11 CIV. 9635 (KMK)

DCH AUTO GROUP, ETAL

Defendant(s)

**AFFIDAVIT OF SERVICE**

---

STATE OF NEW YORK: COUNTY OF NEW YORK  ss:

DAN KNIGHT BEING DULY SWORN DEPOSES AND SAYS DEPONENT IS NOT A PARTY TO THIS ACTION, OVER THE AGE OF EIGHTEEN YEARS AND RESIDES IN THE STATE OF NEW YORK.

That on May 1, 2013 at 04:00 PM at

955 ROUTE 9 NORTH
SOUTH AMBOY, NJ 08879

deponent served the within SUMMONS AND COMPLAINT FOR EMPLOYMENT DISCRIMINATION; AMENDED COMPLAINT FOR EMPLOYEE DISCRIMINATION; SECOND AMENDED COMPLAINT;* on DCH AUTO GROUP therein named,

**SUITABLE AGE**  by delivering thereat a true copy of each to KAREN O'CALLAGHAN a person of suitable age and discretion. Said premises is Defendant's actual place of business within the state. She identified herself as the GENERAL-AGENT of the Defendant.

Deponent further states that he describes the person actually served as follows:

| Sex | Skin Color | Hair Color | Age (Approx.) | Height (Approx.) | Weight (Approx) |
|-----|-----------|-----------|---------------|------------------|-----------------|
| FEMALE | WHITE | BROWN | 58 | 5'5 | 140 |

**MAILING**  Deponent enclosed a copy of same in a postpaid wrapper properly addressed to the Defendant at the Defendant's actual place of business at

955 ROUTE 9 NORTH
SOUTH AMBOY, NJ 08879

and deposited said wrapper in a post office or official depository under exclusive care and custody of the United States Postal Service within New York State on May 3, 2013 by REGULAR FIRST CLASS MAIL in an envelope marked PERSONAL & CONFIDENTIAL and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served.

*THIRD AMENDED COMPLAINT

That at the time of such service deponent knew the person so served as aforesaid to be the same person mentioned and described as the Defendant in this action.

Sworn to me on:  May 7, 2013

RALPH MULLEN
Notary Public, State of New York
No. 01MU6236632
Qualified in New York County
Expires April 11, 2015

JOSEPH KNIGHT
Notary Public, State of New York
No. 01KN6178241
Qualified in New York County
Expires November 26, 2015

JONATHAN GRABER
Notary Public, State of New York
No. 01GR6156780
Qualified in New York County
Expires December 4, 2014

DAN KNIGHT

Invoice #: 575725

UNITED PROCESS SERVICE, INC., 3RD FLOOR, 315 BROADWAY, NEW YORK, NY 10007 - (212) 619-0728