UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUCIA MARCIANO,

                              Plaintiff,

        v.

DCH AUTO GROUP, BRIAN LAM, and
BERNARD FEE,

                              Defendants.

No. 11-CV-9635 (KMK)

OPINION & ORDER

Appearances:

John A. Beranbaum, Esq.
Jennifer Lea Smith, Esq.
Beranbaum Menken Ben-Asher & Bierman LLP
New York, NY
*Counsel for Plaintiff*

Dena Calo, Esq.
Kathleen Barnett Einhorn, Esq.
Genova Burns Giantomasi Webster
Newark, NJ
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Lucia Marciano brings this action against DCH Auto Group ("DCH"), a

Delaware corporation that owns and operates a car dealership located in Mamaroneck, New

York, and Brian Lam ("Lam") and Bernard Fee ("Fee"), the General Manager and Sales

Manager, respectively, of that dealership.  (*See* Third Am. Compl. ("Compl.") (Dkt. No. 24)

¶¶ 8–9.)  She alleges three claims of workplace discrimination arising under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, (*see id.* ¶¶ 114–17), the Americans with

Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*, (*see id.* ¶¶ 118–22), and New York's Human Rights

Law, N.Y. Exec. Law §§ 290 *et seq.*, (*see id.* ¶¶ 123–28).  Before the Court is Defendants'

Motion To Compel Arbitration and for Attorneys' Fees.  (*See* Dkt. No. 35 ("Mot.").)  For the

following reasons, Defendants' Motion is granted in part and denied in part.

### I.  Background

#### A.  Factual History

In January 2009, Plaintiff sought a job at a car dealership owned by Defendant DCH.

(*See* Mem. of Law in Supp. of Defs.' Mot. To Compel Arbitration Pursuant to the FAA To

Dismiss Pl.s' Compl. & for Atty's Fees ("Mem.") (Dkt. No. 38) 7.)  Plaintiff completed an

employment application ("Employment Application"), wherein she was asked to submit personal

data and to sign two "Acknowledgement [sic] and Authorization" forms.  (*See* Decl. of Gene

Hallenbeck in Supp. of Defs.' Mot. To Compel Arbitration Pursuant to the FAA & To Dismiss

Pl.s' Compl. ("Hallenbeck Decl.") (Dkt. No. 37), Ex. A.)  One of the forms ("Employment

Agreement") solicited Plaintiff's consent to various terms of employment, such as submission to

random drug and alcohol testing, cooperation in background investigations, and terminable-at-

will status.  (*See id.* at unnumbered 6.)  The other form ("Arbitration Agreement") solicited her

consent to submit certain types of claims against the company arising out of her employment

exclusively to binding arbitration.  (*See id.* at unnumbered 4–5.)  Plaintiff signed and dated both

forms.  (*See id.* at unnumbered 5–6.)

Plaintiff thereafter accepted Defendants' offer of an "Internet Manager" position and

commenced her employment on February 23, 2009.  (*See* Compl. ¶ 10.)  Over the next two

years, Plaintiff alleges that she suffered various forms of harassment and discrimination based on

her gender, (*see id.* ¶¶ 17, 26), and a disability, (*see id.* ¶¶ 29–112).  DCH ultimately terminated

Plaintiff on March 30, 2011.  (*See id.* ¶ 113.)

2

B.  Procedural History

Plaintiff initially filed a pro se Complaint in December 2011, naming DCH as the sole defendant.  (*See* Dkt. No. 2.)  A summons was issued on January 19, 2012, and this Court granted each of Plaintiff's four requests to extend the service deadline, thereby effectively extending the original deadline by over a year.  (*See* Dkt. Nos. 9–13.)  Before she complied with the extended deadline, however, she filed an Amended Complaint—again pro se—in December 2012, re-naming DCH as a defendant and adding Lam and Fee as co-defendants.  (*See* Dkt. No. 15.)  Then, before serving the Amended Complaint, Plaintiff retained a law firm to represent her, and the Court gave her permission to file a Second Amended Complaint, (*see* Dkt. Nos. 18–19, 21), which she filed on April 8, 2013, (*see* Dkt No. 23).  Shortly thereafter, Plaintiff's counsel requested leave to file a Third Amended Complaint due to "several typographical errors" it discovered in the Second Amended Complaint.  (*See* Dkt. No. 22.)  The Court granted this request, (*see id.*), and Plaintiff filed her Third Amended Complaint on April 16, 2013, (*see* Compl.).  Plaintiff completed service on May 13, 2013.  (*See* Dkt. Nos. 25–26, 28.)

On May 10, 2013, Defendants sent a letter to the Court, informing it that they had asked Plaintiff to consider withdrawing her Complaint and submitting the matter to arbitration.  (*See* Dkt. No. 29 (Letter from Dena B. Calo to Court (May 10, 2013)).)  Three days later, Defendants sent a letter requesting a premotion conference to discuss a potential motion to compel arbitration in light of the previously mentioned Arbitration Agreement that Plaintiff signed when she applied for a job with DCH.  (*See* Decl. of Dena B. Calo, Esq. in Supp. of Defs.' Mot. To Compel Arbitration Pursuant to the FAA To Dismiss Pl.s' Compl. & for Att'ys' Fees ("Calo Decl.") (Dkt. No. 36), Ex. J (Letter from Dena B. Calo to Court (May 13, 2013)).)  In response to this letter, Plaintiff's counsel informed the Court that she considered "parts of the arbitration

agreement" to be "ambiguous," and that she had consequently "asked Defendants to stipulate to several additional terms as a condition of [Plaintiff] agreeing to voluntarily dismiss the Complaint and refile in arbitration." (*Id.*, Ex. K at unnumbered 1 (Letter from Jennifer Smith to Court (May 17, 2013)).) Defendants responded directly to Plaintiff's counsel, informing her that Defendants would "not agree to the proposed Stipulation" in general, but that they were "willing to stipulate . . . that they [would] pay all arbitration fees and costs . . . in accordance with [the American Arbitration Association's] Employment Arbitration Rules, as well as the initial filing fee in accordance with the signed Arbitration Agreement." (*Id.*, Ex. L at unnumbered 1–2 (Letter from Dena B. Calo to Jennifer Smith (May 20, 2013)).) At a hearing held on May 23, the Court ordered Plaintiff to respond to Defendants' letter by May 31, (*see* Dkt. (minute entry for May 23, 2013)), and it subsequently granted Plaintiff's request for a two-week extension of that deadline, (*see* Dkt. No. 34).

On June 13, Plaintiff's counsel sent a letter informing Defendants and the Court that Plaintiff "[did] not consent to transferring the case to arbitration." (Calo Decl., Ex. N at unnumbered 1.) Defendants thereafter filed the instant Motion To Compel Arbitration and for Attorneys' Fees on July 1. (*See* Mot.; Mem.) Plaintiff filed an Opposition Memorandum on August 2, (*see* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Compel Arbitration Pursuant to the FAA, To Dismiss Pl.s' Compl. & for Att'ys' Fees ("Opp'n") (Dkt. No. 42)), which was followed by Defendants' Reply Memorandum on August 12, (*see* Reply Mem. of Law in Further Supp. of Defs.' Mot. To Compel Arbitration Pursuant to the FAA, To Dismiss Pl.s' Compl. & for Att'ys' Fees ("Reply") (Dkt. No. 48)). The Court then granted Plaintiff's request to file a Sur-reply Memorandum, (*see* Dkt. No. 49), which Plaintiff filed on September 24, (*see* Pl.'s Sur-reply Mem. of Law ("Sur-reply") (Dkt. No. 50)), and to which Defendant responded on October

7, (*see* Defs.' Mem. of Law in Opp'n to Pl.'s Sur-reply & in Further Supp. of Defs.' Mot. To

Compel Arbitration Pursuant to the FAA, To Dismiss Pl.s' Compl. & for Att'ys' Fees ("Opp'n to

Sur-reply") (Dkt. No. 55)).   The Court now turns to a discussion of Defendants' Motion.

## II.  Discussion

### A.  Arbitration

#### 1.  Legal Standard

Defendants move to compel arbitration under the Federal Arbitration Act ("FAA"),

which allows a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate

under a written agreement for arbitration [to] petition any United States district court [with

jurisdiction] . . . for an order directing that such arbitration proceed in the manner provided for in

such agreement."  9 U.S.C. § 4.  In this specific context, courts "appl[y] a standard similar to that

applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d

Cir. 2003).  Under this standard, the Court evaluates "[a]llegations related to the question of

whether the parties formed a valid arbitration agreement . . . to determine whether they raise a

genuine issue of material fact."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012).

"If there is a genuinely disputed factual issue whose resolution is essential to the determination

of the applicability of an arbitration provision, a trial as to that issue will be necessary."

*Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172

(2d Cir. 2011); *see also* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . be in issue,

the court shall proceed summarily to the trial thereof.").  However, "where the undisputed facts

in the record require the matter of arbitrability to be decided against one side or the other as a

matter of law, [a court] may rule on the basis of that legal issue and avoid the need for further

court proceedings."  *Wachovia Bank*, 661 F.3d at 172 (internal quotation marks omitted); *see*

*also* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561–62 (S.D.N.Y. 2013) ("[A] [c]ourt must grant a motion to compel arbitration if the pleadings, discovery materials before the [c]ourt, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.").

2.  Analysis

The Parties' dispute essentially concerns the "question of arbitrability," i.e. "whether the parties have submitted [this] dispute to arbitration." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotation marks omitted).  To answer this question, courts in the Second Circuit generally "follow a two-part test," whereby they consider "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2857–58 (2010) (noting that a court "should order arbitration of a dispute *only* where the court is satisfied that neither the formation of the parties' arbitration agreement *nor . . . its* enforceability or applicability to the dispute is at issue" (first emphasis added)).  Here, Defendants contend that the Arbitration Agreement is a valid agreement to arbitrate the specific claims raised in Plaintiff's Complaint, thus satisfying both parts of this test.  (*See* Mem. 10–16.) Plaintiff disputes only the first part, arguing that "[t]he only issue to be decided . . . is whether

the parties agreed to arbitrate," such that "other issues . . . , including the scope of the alleged

agreement and whether Plaintiff's claims [are] arbitrable, simply do not come into play . . .

because there was no agreement to arbitrate."  (*See* Opp'n 5.)

"Whether one can be bound by an arbitration clause is usually determined by looking at

generally accepted principles of contract law."  *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d

144, 149 (2d Cir. 2004); *see also Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002)

("[T]he ultimate question of whether the parties agreed to arbitrate is determined by state law.").[1]

Pursuant to these principles, "a party is bound by the provisions of a contract that [s]he signs,

unless [s]he can show special circumstances that would relieve h[er] of such an obligation."

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987).  In the context of

evaluating whether "special circumstances" sufficient to warrant relief from an arbitration

agreement exist, "the party resisting arbitration bears the burden of proving that the claims at

issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91

(2000).

Plaintiff argues that the Arbitration Agreement is not enforceable for four independent

reasons.  First, she argues that she did not see, read, or understand the Agreement, possibly due

to Defendants' actions.  Second, she argues that the Agreement consists of an illusory promise.

---

[1] Although the Arbitration Agreement does not specify which state's law applies to the agreement, the Parties' Memoranda apply New York law.  (*See* Mem. 11 (applying New York law); Opp'n 6 (same).)  Consequently, the Court applies New York law when interpreting the agreement.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("[T]he parties' briefs assume that New York law controls . . . , and such implied consent . . . is sufficient to establish choice of law." (internal quotation marks omitted) (third alteration in original)).

Third, she argues that she received no consideration for agreeing to binding arbitration.  Fourth, she argues that the Agreement is substantively unconscionable because of the high costs it imposes on her.  The Court will address each argument in turn.

### a.  Lack of Assent

Plaintiff first argues that, although her signature appears on the Arbitration Agreement, she "never agreed to arbitrate her claims."  (Sur-reply 1 (alterations omitted).)  Specifically, she argues that "language relating to arbitration . . . was not on any page that [she] saw or signed," that "Fee pressured [her] into signing [both] Acknowledgement [sic] and Authorization pages and misrepresented to her that by signing, she was only assenting to the language he read to her above the signature lines," which language "did not include the alleged agreement to arbitrate," and that "Fee never said anything to [her] about arbitration and deliberately prevented her from reading the language on the reverse side of her signature pages that discussed arbitration."  (*Id.* at 2.)

According to Defendants, the Employment Application was presented to Plaintiff as a "tri-fold document" consisting of three double-sided pages connected to each other such that the entire six-page application was printed on a single, twenty-five-and-a-half-inch-wide sheet of paper.  (*See* Decl. of Carrie Ferrantino in Further Supp. of Defs.' Mot. To Compel Arbitration Pursuant to the FAA, To Dismiss Pl.s' Compl. & for Att'ys' Fees ("Ferrantino Decl.") (Dkt. No. 47) ¶¶ 6–7; *id.*, Ex. A (containing photographs of the original Employment Agreement).)[2]

---

[2] Plaintiff asserts that, "because Defendants have raised [this] argument in their reply papers for the first time, and submitted new evidence, [the argument and the evidence] should be disregarded."  (Sur-reply 1.)  However, consideration of the argument and the evidence is appropriate because it was directly responsive to claims Plaintiff made in her Memorandum of Law and associated Declaration.  (*See* Opp'n 1–2 ("[T]he application was a three page document that made no reference at all to arbitration. . . .  At no point during the application process was

Initially, Plaintiff's recollection of the Application implicitly conflicted with Defendants'

recollection, in that Plaintiff described the Application as consisting of six unattached, single-

sided pages:

> Fee handed me an employment application, containing three pages for me to fill out.
> . . .
>
> . . . .
>
> When I had finished filling out the three pages . . . I returned [them] to Fee.
>
> . . . . After a few minutes Fee called me to his office and told me that I had to sign
> the employment application.  I told Fee that I did not see a place for my signature.
> Fee showed me *two additional pages, neither of which were part of the original
> three page application*, and told me that I had to sign both pages. . . .  Fee told me
> that the two pages were supposed to be attached to my employment application and
> explained that these papers got lost in the mess of papers on his desk. . . .
>
> . . . .
>
> Fee told me the pages were not numbered and he place[d] them behind my
> employment application . . . .

(Decl. of Lucia Marciano ("Marciano Decl.") (Dkt. No. 44) ¶¶ 3–8 (emphasis added).)

However, after Defendants submitted photographs of the original tri-fold application, showing

that all three pages were connected, Plaintiff offered a different recollection:

> When Fee handed me the employment application, *it was folded*.  The only page that
> was visible was the first page, which had the words "Application for
> Employment—NY" on the top.  I filled that page out and turned over that first page.

---

[Plaintiff] ever shown the actual arbitration agreement that is the subject of this motion; she was
presented with two signature pages, neither of which themselves contained any information
about arbitration."); Decl. of Lucia Marciano ("Marciano Decl.") (Dkt. No. 44) ¶¶ 3, 5–6, 8.)
Moreover, there is no prejudice because the evidence is merely another copy of the same
document provided in the moving papers, and the Court granted Plaintiff leave to file a Sur-reply
Memorandum in response.

When I did so, only the second and third pages were visible—the pages that have the words "Employment History" . . . and "Education" . . . on top. I filled those out as well. . . .

I did not see any other pages when I filled out the employment application. I returned the application to Fee.

After a few minutes, Fee called me into his office and . . . . told me that I had to sign two pages that *I believed were separate pages* because he never told me they were attached on the backside of my employment application and I had not seen any pages other than the three I had filled out. . . .

Fee[,] still holding the application, showed me the signature page [for the Employment Agreement] and told me to sign. He then showed me [the signature page for the Arbitration Agreement] and told me to sign that page also. Fee refused to give me either page to read on my own, and rushed me through the language on the pages while I tried to follow along. There was no language on either page about arbitration.

. . . .

[I]t appears [that] a page containing alleged arbitration language . . . may have been on the reverse side of one of the signature pages *that was folded behind the last page* of my application, but I did not see that page and was not notified of it. Nothing required me to read, fill out or sign that page at the time I filled out the 3 page application. There was no language on either signature page to notify me that there was arbitration language on the reverse side or that my signature meant I was agreeing to arbitration. Fee did not turn the page over to show me the reverse side, when he told me that I had to sign [the two signature pages], and rushed me to sign them. Fee did not show me the page containing arbitration language and he did not tell me anything about arbitration before I signed. Fee refused to give me the page to read on my own[. I]n fact, I believe he deliberately misrepresented the Acknowledgment and Authorization signature pages and prevented me from seeing the page containing arbitration language . . . .

(Decl. of Lucia Marciano ("Second Marciano Decl.") (Dkt. No. 51) ¶¶ 2–5, 8 (emphasis added).)

Plaintiff thus ultimately agrees with Defendants as to the form of the Employment Application and the placement of both pages of the Arbitration Agreement, but she disputes Defendants' contention that her signature constituted a valid acceptance of that agreement.

Under New York law, "[a] party is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a [document] on the ground that he or she did not read it or know its contents." *Brandywine Pavers, LLC v. Bombard*, 970 N.Y.S.2d 653, 655 (App. Div. 2013) (internal quotation marks omitted) (second alteration in original); *see also In re Lehman Brothers Inc.*, 478 B.R. 570, 587 n.19 (S.D.N.Y. 2012) (noting that, under New York law, "[a] party's failure to read or understand a contract that it signs does not relieve it of its obligation to be bound by the contract"); *Superior Officers Council Health & Welfare Fund v. Empire HealthChoice Assurance, Inc.*, 927 N.Y.S.2d 324, 326 (App. Div. 2011) ("[P]arties are presumed to know the contents of the agreements they have signed." (citation omitted)).  Furthermore, "[a] signer's duty to read and understand that which it signed is not diminished merely because [the signer] was provided with only a signature page." *Dasz, Inc. v. Meritocracy Ventures, Ltd.*, 969 N.Y.S.2d 653, 655 (App. Div. 2013) (citations and internal quotation marks omitted) (alterations in original); *see also Overseas Private Inv. Corp. v. Kim*, 895 N.Y.S.2d 217, 219–20 (App. Div. 2010) (enforcing an agreement against a party who claimed that "she was only provided with the last page of the agreement" and that "she signed [it] without seeing the entire document").  Thus, Plaintiff's contention that she did not read the entire Arbitration Agreement, by itself, does not create a material factual dispute, because "a party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms." *Patterson v. Somerset Investors Corp.*, 946 N.Y.S.2d 217, 218 (App. Div. 2012) (citations and internal quotation marks omitted); *see also Smith v. Lehman Bros., Inc.*, No. 95-CV-10326, 1996 WL 383232, at *1 (S.D.N.Y. July 8, 1996) (holding that plaintiff's assertions "that he was never provided with a copy of the [employment] application nor was he aware of the arbitration provision" did not, standing alone, "constitute economic duress,

coercion, or fraud," such that plaintiff was "conclusively presumed to have assented to submit his claims to arbitration").[3]

Because a "wrongful act on the part of [a] contracting party" creates an exception to the general rule that "a party who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them," Plaintiff alleges multiple acts that, she contends, make the Arbitration Agreement unenforceable. *See Gold*, 365 F.3d at 149 (internal quotation marks omitted) (second alteration in original); *see also Isaacs v. OCE Bus. Servs., Inc.*, — F. Supp. 2d —, 2013 WL 4744807, at *3 (S.D.N.Y. Sept. 4, 2013) ("The plaintiff in this case does not dispute that he signed, dated, and spelled out his name on the [agreement] as a condition of his employment . . . .  Therefore, he is bound by the [agreement] unless he can show special grounds, such as fraud, duress or coercion, which would justify the revocation or

---

[3] Plaintiff cites two cases that appear to be at odds with this holding, both of which are unavailing. First, Plaintiff cites *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002), for the proposition that a party is not bound to contractual language that she did not read "when the writing [did] not appear to be a contract and the terms [were] not called to the attention of the recipient." (Sur-reply 2 (quoting *Specht*, 306 F.3d at 30) (internal quotation marks omitted).)  In *Specht*, however, the Second Circuit applied California law—and, in fact, the entirety of the quoted language came from a California court decision. *See Specht*, 306 F.3d at 30 (quoting *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 107 Cal. Rptr. 2d 645, 651 (Ct. App. 2001)).  Second, Plaintiff cites *Arthur Philip Export Corp. v. Leathertone, Inc.*, 87 N.Y.S.2d 665 (App. Div. 1949), for the proposition that "a party should not be bound by clauses printed on the reverse side of a document unless it is established that such matters were properly called to its attention and that it assented to the provisions there stated." (Sur-reply 2–3 (quoting *Arthur Philip Export Corp.*, 87 N.Y.S.2d at 667) (internal quotation marks omitted).)  Regardless of whether this holding still applies in light of the Appellate Division's more recent holdings, *e.g. Dasz*, 969 N.Y.S.2d at 655 (holding that "[a] signer's duty to read and understand that which it signed is not diminished merely because [the signer] was provided with only a signature page"), the Second Circuit has applied New York contract law to reject this argument. *See Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 293, 297 (2d Cir. 1999) (holding that plaintiff "was bound by the arbitration clause printed on the reverse side of" a contract, even though it "denied ever receiving or reading the reverse side of the form").

nonenforcement of contract."). These include Plaintiff's allegations—made in her second Declaration—that Fee "rushed [her] through the language on the [signature] pages while [she] tried to follow along," that "[t]here was no language on either [signature] page about arbitration," that Fee represented to her that "there was no language [in the agreement] other than what Fee had already shown [her] on the signature pages he made [her] sign," that "Fee did not show [her] the page containing arbitration language and he did not tell [her] anything about arbitration before [she] signed," that he "refused to give [her] the page to read on [her] own," and that she "believe[s] he deliberately misrepresented the Acknowledgment and Authorization signature pages." (Second Marciano Decl. ¶¶ 5, 7–8.)[4]

Plaintiff does not argue that these allegations satisfy the elements of any specific legal doctrine—such as fraud, duress, coercion, or misrepresentation—that would justify invalidating the Arbitration Agreement. However, a review of potentially applicable doctrines reveals that none apply to this case. To state a claim for fraud, Plaintiff must establish that it was reasonable for her to rely on Defendants' alleged misrepresentation. *See Cont'l Airlines, Inc. v. Lelakis*, 943 F. Supp. 300, 305 (S.D.N.Y. 1996) ("A party's mere assertion of reliance . . . is not sufficient to support a defense of fraudulent inducement; the party's reliance must be reasonable under the circumstances."); *Kinsella v. Powerguard Specialty Ins. Servs., LLC*, 976 N.Y.S.2d 65, 66 (App. Div. 2013) (dismissing fraudulent-inducement claim because the plaintiff "failed to sufficiently allege reasonable reliance"); *Dabriel, Inc. v. First Paradise Theaters Corp.*, 952 N.Y.S.2d 506, 521 (App. Div. 2012) (dismissing fraudulent-inducement claim where "it was not reasonable for

---

[4] In her first Declaration, Plaintiff alleged that "Fee rushed [her] through both [signature pages], pointing to selected sentences and reading through them while [she] tried to follow along," and that she "was never given the opportunity to read" the first page of the Arbitration Agreement. (Marciano Decl. ¶¶ 6, 11.)

plaintiffs to rely on . . . oral representations from defendant" that contradicted the "express[]" terms of the agreement); *Whitehead v. Town House Equities, Ltd.*, 780 N.Y.S.2d 15, 17 (App. Div. 2004) ("To sustain a cause of action sounding in fraud, a party must show . . . justifiable reliance of the other party on the misrepresentation or material omission . . . ." (internal quotation marks omitted)).  Alternatively, she can show that her "ignorance" of the contents of the agreement was nevertheless "excusable."  *Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 335–36 (E.D.N.Y. 2009) (holding that, where a party argues that he or she "sign[ed] [a contract] without knowing or having a reasonable opportunity to know of [the contract's] character or essential terms," the party "is not absolved of the basic responsibility to review a document before signing it and must show excusable ignorance of the contents of the writing signed" (alterations and internal quotation marks omitted)).  Moreover, although a contract may be void due to a "misread[ing] or misrepresent[ation] . . . by the other party," this rule generally applies "where the signer is illiterate, or blind, or ignorant of the alien language of the writing." *In re Toscano*, 799 F. Supp. 2d 230, 245 (E.D.N.Y. 2011) (internal quotation marks omitted) (quoting *Cash v. Titan Fin. Servs., Inc.*, 873 N.Y.S.2d 642, 645 (App. Div. 2009)).  Plaintiff has not made any such allegation.  Additionally, in light of the language on the page Plaintiff admittedly reviewed and signed, it would have been unreasonable for her to rely on Fee's alleged representation that the Agreement contained no other relevant language, or any other oral representation made by Fee.  Immediately above the signature line, the words "DO NOT SIGN THIS UNTIL YOU HAVE READ THE ABOVE STATEMENT & AGREEMENT" appear in bold, capitalized letters.  (*See* Marciano Decl., Ex. C; Second Marciano Decl. ¶ 7.)  These words, in turn, appeared below language informing Plaintiff that "[i]f [she] ha[d] any questions regarding this statement," she should "ask a Company representative before signing."  (Marciano

14

Decl., Ex. C (emphasis removed).)  Therefore, "[i]f [Plaintiff] had questions concerning the document, it was [her] responsibility to raise them prior to placing [her] signature on th[e] document."  *DeBono v. Wash. Mut. Bank*, No. 05-CV-10333, 2006 WL 3538938, at *2 (S.D.N.Y. Dec. 8, 2006); *see also Moss v. Rent-A-Center, Inc.*, No. 06-CV-3312, 2007 WL 2362207, at *5 (E.D.N.Y. Aug. 15, 2007) ("If Plaintiffs did not understand the form of the arbitration agreement or had questions about it, the burden was upon them to have their concerns addressed before placing their signatures on the agreement.").

The language on that page also includes an acknowledgment that "[n]o implied, oral or written agreements contrary to the express language of this agreement are valid unless they are in writing and signed by the President of the Company," and that "[n]o supervisor or representative of the Company, other than the President of the Company, has any authority to make any agreements contrary to the foregoing."  (*See* Marciano Decl., Ex. C; Second Marciano Decl. ¶ 7.)  This language thus "destroys" Plaintiff's allegations "that the agreement was executed in reliance upon . . . contrary oral representations," including any oral representations about the meaning of the contract or the lack of other contractual language.  *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959); *see also Minuteman Press Int'l, Inc. v. Matthews*, 232 F. Supp. 2d 11, 16 (E.D.N.Y. 2002) (rejecting a "fraud in the inducement" claim that was "based on alleged oral misrepresentations in the face of . . . clear and unambiguous [contractual] language").

Finally, Plaintiff's purported reliance on Fee's alleged representation that the signature page contained the entirety of the Agreement's language would have been unreasonable in light of the first sentence on the page, which is, in fact, a sentence fragment.  (*See* Marciano Decl., Ex. C (Arbitration Agreement signature page, beginning with the sentence fragment "Company's

15

unrestricted option at any time, with or without good cause").)  *See Sorenson v. Bridge Capital Corp.*, 861 N.Y.S.2d 280, 282 (App. Div. 2008) (dismissing a claim because the "[p]laintiff's negligent failure to read the agreements prevent[ed] him from establishing justifiable reliance"); *cf. U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 443 (S.D.N.Y. 2010) ("[T]he signer of a deed or other instrument . . . is conclusively bound thereby . . . .  If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him." (alterations in original) (internal quotation marks omitted) (quoting *Pimpinello v. Swift & Co.*, 170 N.E. 530, 531 (N.Y. 1930))).

In addition to alleging that Fee effectively concealed the other page of the Arbitration Agreement from her, Plaintiff also alleges that Fee actively prevented her from reading it.  (*See* Second Marciano Decl. ¶ 8 ("Fee refused to give me the [signature] page to read on my own[, and,] in fact, I believe he deliberately misrepresented the Acknowledgment and Authorization signature pages and prevented me from seeing the page containing arbitration language . . . .").) Courts have recognized that a party might not be bound by a contract where the other party prevents it from reading the contract's terms.  *See, e.g.*, *In re Toscano*, 799 F. Supp. 2d at 245 (rejecting party's claim that he did not assent to the terms of an agreement where there was no evidence in the record that the party "was impaired or otherwise personally prevented from reading the" agreement); *Dunn v. Northgate Ford, Inc.*, 794 N.Y.S.2d 449, 451 (App. Div. 2005) (noting that the plaintiff was "deemed to be conclusively bound by [a contract's] terms whether or not . . . she read [them]" absent an allegation that "defendants committed any cognizable wrongdoing to . . . preclude her from reading [the terms]" (second alteration in original) (internal quotation marks omitted)).  Here, however, Plaintiff offers no more than self-serving speculation

16

that she "believe[s]" that Fee "prevented [her] from seeing the page containing [the] arbitration language." (Second Marciano Decl. ¶ 8.)  Moreover, her allegation that Fee "refused to give [her]" the Agreement "to read on [her] own," (*id.*), is belied by her concession that Fee gave her the opportunity to review and complete the entire employment application when Plaintiff initially inquired about a position.  (*See id.* ¶¶ 2–3 (admitting that "Fee handed [her] the employment application," and that she "returned the application to Fee" after filling out three of the six pages); Marciano Decl. ¶¶ 3, 5 (admitting that "Fee handed [Plaintiff] an employment application[] . . . for [her] to fill out," and that "[w]hen [she] had finished filling [it] out . . . , [she] returned [it] to Fee").)[5]

Furthermore, Plaintiff has not sufficiently alleged that Defendants used "high pressure tactics or any other form of coercion in attaining her consent."  *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 572 (S.D.N.Y. 2009).  Although she alleges that Fee "rushed [her] through the language" and "rushed [her] to sign" the agreements, (Second Marciano Decl. ¶¶ 5, 8), she also alleges that she was able to ask Fee to clarify at least some of the language on the signature page, and that Fee was responsive to this request, (*see id.* ¶ 7).[6]  And even if Fee

---

[5] Although Plaintiff disputes Defendants' account of the circumstances surrounding the contract signing, the Court will not allow her to create a fact dispute through her own contradictory statements made in two affidavits.  (*See* Marciano Decl. ¶¶ 6, 8 (alleging that the employment-application pages were not attached to each other); Second Marciano Decl. ¶ 2 (conceding that the pages were folded and attached).)  *See Margo v. Weiss*, 213 F.3d 55, 60–61 (2d Cir. 2000) ("[T]he plaintiffs cannot defeat a motion for summary judgment by responding with affidavits recanting . . . earlier testimony. . . .  [A]n attempt to conjure up a triable issue of fact through the proffer of a late affidavit . . . . will [not] defeat a motion for summary judgment."); *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

[6] Plaintiff specifically alleges that she "asked Fee what [the words "Please continue to Back Page" on the Arbitration Agreement's signature page] meant," and that "he told [her that]

17

did rush her, she still had to satisfy her "obligation to read [the] document before [she] sign[ed] it." *Brandywine Pavers*, 970 N.Y.S.2d at 655 (internal quotation marks omitted); *see also Martin v. Creative Mgmt. Grp., Inc.*, No. 10-CV-2214, 2010 WL 2629580, at *2 (S.D.N.Y. June 29, 2010) ("[A] person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms." (internal quotation marks omitted)); *Beatie & Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 392 (S.D.N.Y. 2006) (rejecting an argument that a contract was invalid where the party alleging fraud "had a duty to read and understand the contents of the [contract] before accepting it," that task "would not have been strenuous," and the party did not otherwise demonstrate fraud); *Elite Parfums, Ltd. v. Rivera*, 872 F. Supp. 1269, 1273 (S.D.N.Y. 1995) (rejecting an argument that a contract clause was void for lack of time to review it because the party "had no need to sign the contract before having it translated and reviewed by an attorney; he could have simply informed the plaintiff that he needed more time"); *cf. Shklovskiy v. Khan*, 709 N.Y.S.2d 208, 209–10 (App. Div. 2000) ("[A] party will not be excused from his failure to read and understand the contents of a release. A party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms. Persons who are illiterate in the English language are not automatically excused from complying with the terms of a contract which they sign simply because they could

---

the pages were not numbered and answered . . . that the 'Back Page' was the page he made [her] sign first," i.e. the signature page of the Employment Agreement. (Second Marciano Decl. ¶ 7.) Plaintiff further alleges that she "understood [Fee's response] to mean that there was no language other than what [he] had already shown [her] on the signature pages he made [her] sign." (*Id.*)  However, the photographs of the Employment Application make clear that Fee's explanation fairly interpreted the language, because in the context of the tri-fold document, where the Arbitration Agreement preceded the Employment Agreement, the latter document was, in fact, the "Back Page" of the entire Employment Application. (*See* Ferrantino Decl., Ex. A.)

not read it.  Such persons must make a reasonable effort to have the contract read to them."
(citation omitted)).  Moreover, Plaintiff has not sufficiently alleged that she was under duress
when she signed the Agreement in the context of her concession that she voluntarily sought
employment and voluntarily completed the entire Employment Application, including the two
signature pages.  *See Tarulli v. Circuit City Stores, Inc.*, 333 F. Supp. 2d 151, 157–58 (S.D.N.Y.
2004) (finding "no fraud, duress, unconscionability or wrongful act" and therefore "a valid
agreement to arbitrate" where plaintiff "voluntarily attended the [d]efendant's job fair" and
"voluntarily signed [an arbitration agreement], even without . . . reviewing the [a]greement").
*Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377 (S.D.N.Y. 2002), the one case Plaintiff cites
to support her argument, (*see* Sur-reply at 2), is specifically distinguishable on that basis.  *See*
*Isaacs*, 2013 WL 4744807, at *4 (distinguishing *Brennan*—where the arbitration agreement was
"signed during the course of the plaintiff's employment," "plaintiff was given 15 minutes to
review a newly instituted 'sixteen-page single-spaced' arbitration agreement," she was "told she
would be ineligible for promotions if she did not sign it," "the terms of the arbitration agreement
. . . allowed the company to modify it at any time," and the agreement "denied the plaintiff the
right to proceed on an already pending sexual harassment claim against the company"—from the
case at hand, where the arbitration agreement "was given to the plaintiff as a condition of his
employment at the outset," it "did not require the plaintiff to discontinue already pending
litigation," it "was only two pages long and legibly printed," and "the terms of the [agreement]
ma[d]e no mention of any unilateral right . . . to modify the agreement"); *Valdes v. Swift Transp.*
*Co.*, 292 F. Supp. 2d 524, 533 (S.D.N.Y. 2003) (distinguishing *Brennan* because, "to the extent
that the coercion in *Brennan* arose from the employee's fear of losing her job, plaintiff in [the]
case [at hand] was not similarly situated, as she had not yet been hired"); *Stewart v. Paul,*

*Hastings, Janofsky & Walker, LLP*, 201 F. Supp. 2d 291, 294 (S.D.N.Y. 2002) (distinguishing *Brennan* because "the agreement in that case was forced upon the plaintiff after the dispute arose rather than prior to the acceptance of the employment and was obtained in manifestly unfair circumstances"). The Court therefore finds that none of Plaintiff's allegations is sufficient to create a genuine dispute over a material fact related to the validity of Plaintiff's assent to the Arbitration Agreement.

### b. Illusory Promise

Plaintiff next contends that, even if she assented to the Arbitration Agreement, it is nonetheless unenforceable because it contains an illusory promise. *See In re 114 Tenth Ave. Assoc., Inc.*, 441 B.R. 416, 428 (S.D.N.Y. 2010) ("[I]f the promisor is free to perform it or not, as he wills, [a promise] is wholly illusory and will not be enforced." (internal quotation marks omitted)); *Strobe v. Netherland Co.*, 283 N.Y.S. 246, 252 (App. Div. 1935) ("The promises of neither party are binding unless those of both are obligatory."). Plaintiff does not dispute that the Arbitration Agreement provides that Plaintiff and DCH "both agree that any claim, dispute, and/or controversy" within the scope of the agreement "shall be submitted to and determined exclusively by binding arbitration," and that both Plaintiff and DCH agreed to "give up [their] rights to trial by jury" when Plaintiff executed the agreement. (Marciano Decl., Ex. D (emphasis removed).) Plaintiff nevertheless grounds her argument in subsequent language appearing at the bottom of the first page of the Arbitration Agreement and continuing to the second page:

> If hired, I agree as follows: My employment and compensation are terminable at-will, are for no definite period, and my employment and compensation may be terminated by the Company at any time and for any reason whatsoever, with or without good cause at the option of either the Company or myself. Consequently, all terms and conditions of my employment, with the exception of the arbitration agreement, may be changed or withdrawn at the Company's unrestricted option at any time, with or without good cause. No implied, oral or written agreements

20

> contrary to the express language of this agreement are valid unless they are in writing
> and signed by the President of the Company.  No supervisor or representative of the
> Company, other than the President of the Company, has any authority to make any
> agreements contrary to the foregoing.  This agreement is the entire agreement
> between the Company and the employee, and takes the place of all prior agreements,
> representations, and understandings of the employee and the Company.

(*Id.*, Exs. C, D (emphasis removed).)  She contends that this language "gives Defendants . . . the unrestricted right to modify" the Agreement, such that DCH "can do whatever [it] wants with respect to the [Agreement], including decide that it does not apply to the company's claims." (Opp'n 9–10.)

"[U]nder New York law, contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011).  However, a court "should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Id.* at 568 (internal quotation marks omitted).  Plaintiff's reading of the Arbitration Agreement fails under this standard.  First, although the Agreement states that "all terms and conditions of . . . employment . . . may be changed or withdrawn at the Company's unrestricted option at any time, with or without good cause," that provision *expressly excludes* the Arbitration Agreement. (Marciano Decl., Exs. C, D (applying provision to "all terms and conditions of [Plaintiff's] employment, *with the exception of the arbitration agreement*" (emphasis added)).)  Second, Plaintiff's argument that the following sentence "make[s] it clear that Defendants *can* make oral or written agreements contrary to the express language of the foregoing purported 'agreement' as long as they are signed by the President of the Company," (Opp'n 9–10 (emphasis in original)), also fails, because that sentence makes the President's signature a necessary *but not sufficient*

condition to the effectiveness of any "implied, oral or written agreements contrary to the express

language" of the contract—i.e., such agreements "are [not] valid *unless* they are in writing and

signed by the President of the Company," (Marciano Decl., Ex. C (emphasis added)).  Third,

*Piano v. Premier Distributing Co.*, 107 P.3d 11 (N.M. Ct. App. 2004), wherein the New Mexico

Court of Appeals found an arbitration agreement to be an unenforceable illusory promise after

addressing what Plaintiff contends was a "nearly identical fact situation," (Opp'n 10), is readily

distinguishable.  In that case, an employee handbook provided that "[t]he Company retain[ed]

the right to add, change or delete wages, benefits, policies and all other working conditions at

any time (except the policy of at-will employment and Arbitration Agreement . . . .)." *Piano*,

107 P.3d at 15 (internal quotation marks omitted).  But it further specified that the arbitration

agreement "may not be changed, altered, revised or modified unless in writing and signed by the

Owner of the Company." *Id.*  The New Mexico Court of Appeals held that "the most natural

reading of [this language was] that although [the Company] [could not] modify the terms of the

Arbitration Agreement any way or at any time, it [could], in its sole discretion, modify the terms

of the Arbitration Agreement provided that it complie[d] with the minimal formalities set forth,"

and it noted that the agreement was "completely silent with respect to Plaintiff's signature or

approval." *Id.*  Here, however, the Arbitration Agreement's presidential-signature condition

applies only to the validity of "implied, oral or written *agreements*," (Marciano Decl., Ex. C

(emphasis added)), and not, as in *Piano*, to any "change[s], alter[ations], revis[ions] or

modifi[cations]," 107 P.3d at 15, whether agreed to or not.  Unlike *Piano*, therefore, this

Agreement is not "silent with respect to Plaintiff's . . . approval," *id.*, because it specifically

applies to agreements between Plaintiff and DCH.  Plaintiff is thus incorrect that "Defendants

remain[ed] free to selectively abide by [their] promise to arbitrate." (Opp'n 11 (internal

quotation marks omitted).)  Accordingly, the Court rejects Plaintiff's claim that the Arbitration

Agreement is an unenforceable illusory promise.

### c.  Consideration

Plaintiff next contends that the Arbitration Agreement is unenforceable because Plaintiff

received "no consideration" for her "purported promise to submit to arbitration."  (Opp'n 12.)

She specifically claims that she was "promised nothing in return for her giving up her right to [a]

jury trial," in that "Defendants [did] not agree to consider her application" in return for signing

the Agreement, and "they [did] not offer her employment[,] . . . continued employment[,] . . .

[or] any other benefit to which Plaintiff was not otherwise entitled."  (*Id.*)  Moreover, she asserts

that there was no "detriment to Defendants."  (*Id.*)  Even if Plaintiff was correct that Defendants

did not promise to hire or to consider hiring her in exchange for signing the Arbitration

Agreement, the Agreement by itself contains sufficient consideration because, as discussed, it

mutually binds both parties to submit claims exclusively to arbitration.  *See Hellenic Lines, Ltd.*

*v. Louis Dreyfus Corp.*, 372 F.2d 753, 758 (2d Cir. 1967) (holding that a party's "promise to

arbitrate was sufficient consideration to support [the other party's] promise to arbitrate"); *Teah v.*

*Macy's Inc.*, No. 11-CV-1356, 2011 WL 6838151, at *5 (E.D.N.Y. Dec. 29, 2011) ("There is

clearly adequate consideration for the arbitration agreement, as it binds both parties to arbitrate

their claims, and formed part of a valid employment agreement."); *Meyer v. Starwood Hotels &*

*Resorts Worldwide, Inc.*, No. 00-CV-8339, 2001 WL 396447, at *1 (S.D.N.Y. Apr. 18, 2001)

("[In] a contract to arbitrate disputes respecting employment, . . . the mutually binding nature of

the arbitration clause constitutes valid consideration.").  Plaintiff's claim that the Agreement is

unenforceable for lack of consideration thus fails.

d.  Substantive Unconscionability

Plaintiff finally claims that the Agreement is unenforceable because it is substantively unconscionable due to the "more than speculative" "risk of prohibitive arbitration cost[s]." (Opp'n 15.)  She specifically asserts that "[c]osts are not addressed in the alleged agreement," that "Defendants are only obligated to pay the initial filing fee," and that "Defendants nowhere agree[d] to abide by any particular set of rules . . . that would govern the allocation of costs between the parties."  (*Id.*)  In this context, she further asserts that "she is not in a position to afford the costs associated with arbitration," and that she will thus "be effectively precluded from vindicating her rights should she be forced to arbitrate."  (*Id.*)  *See Green Tree Fin. Corp.- Ala.*, 531 U.S. at 90 (noting that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum").

"[W]here . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  *Green Tree Fin. Corp.-Ala.*, 531 U.S. at 92.  Furthermore, an asserted "risk" that a plaintiff "will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement."  *Id.* at 91 (internal quotation marks omitted).  Plaintiff asserts that "the risk of prohibitive arbitration cost is more than speculative" in this case because "[s]hould [she] have to absorb *any part* of the cost of arbitration herself, the cost to her will be prohibitive."  (Opp'n 15.)  This assertion, in turn, is based on her assertion that she is "unemployed and [has] no income," that she "ha[s] no money," that she "ha[s] incurred significant debt for necessary living expenses," and that she is "entirely reliant on a family member."  (Marciano Decl. ¶ 13.)  These allegations, however, do not satisfy Plaintiff's burden to show a "likelihood of incurring [prohibitively expensive] costs," for multiple reasons.

24

First, the Arbitration Agreement expressly states that DCH "will initially pay for any and all filing fees associated with the arbitration." (*Id.*, Ex. D.) Plaintiff has identified no costs beyond these fees that she might incur. Second, the Agreement provides that DCH "agrees not to seek any costs, filing fees, or . . . attorneys' fees" from Plaintiff, "but rather will bear these costs regardless of the outcome of the arbitration." (*Id.*) Not only does this provision effectively guarantee that Plaintiff bears no financial risk in arbitrating her claims with respect to Defendants' ability to seek reimbursement, it appears to make arbitration somewhat less likely to be prohibitively costly than litigation in this Court in the context of Defendants' demonstrated willingness—in this Motion—to seek attorneys' fees from Plaintiff. Finally, in light of Defendants' offer during this litigation to pay "all arbitration fees and costs (e.g. hearing room rental fee, arbitrator costs) . . . as well as the initial filing fee," (Calo Decl., Ex. L), Plaintiff cannot demonstrate more than a speculative risk that she will bear these costs—unless, of course, she declines Defendants' offer. In any event, the Court finds that Plaintiff has not met her burden in a way that "justif[ies] the invalidation of [the] arbitration agreement." *Green Tree Fin. Corp.-Ala.*, 531 U.S. at 91.

### 3.  Conclusion—The Arbitration Agreement Is Enforceable

For the foregoing reasons, the Court finds that the Arbitration Agreement constitutes "a valid agreement to arbitrate." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d at 128. And, because Plaintiff did not dispute the issue, the Court also finds that Plaintiff's claims "come[] within the scope of the arbitration agreement." *Id.* (*See also* Marciano Decl., Ex. D (providing that the Arbitration Agreement would apply to "any claim, dispute, and/or controversy," including "any claims of employment discrimination, harassment, and/or retaliation under Title VII and all other applicable federal, state, or local statute, regulation or common law

25

doctrine[,] . . . arising from, related to, or having any relationship or connection whatsoever with [Plaintiff's] . . . employment by, or other association with the Company, whether based on tort, contract, statutory, or equitable law, or otherwise").)[7]  Moreover, although the Parties did not discuss this issue, the Court notes that the Arbitration Agreement between Plaintiff and DCH also appears to require Plaintiff to arbitrate her claims against Fee and Lam.  (*See* Marciano Decl., Ex. D (requiring Plaintiff to arbitrate claims "between [herself] and [DCH] (and/or its subsidiaries, affiliates, owners, directors, officers, managers, employees, agents, and parties affiliated with its employee benefit and health plans)").)  The Court thus grants Defendants' Motion To Compel Arbitration.  *See Forbes v. A.G. Edwards & Sons, Inc.*, No. 08-CV-552, 2009 WL 424146, at *3 (S.D.N.Y. Feb. 18, 2009) ("When a district court determines that the issue before it is referable to arbitration pursuant to an arbitration agreement, the FAA 'leaves no place for the exercise of discretion,' but instead, mandates that the court 'direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985))).  And it stays the case pending the arbitration.  *See* 9 U.S.C. § 3 ("[T]he court . . . , upon being satisfied that the issue . . . is referable to arbitration under . . . an agreement, *shall* on application of one of the parties *stay the*

---

[7] Although the Parties do not appear to dispute this issue, the Court notes that claims brought under Title VII, the ADA, and New York's Human Rights Law ("NYHRL") are arbitrable.  *See Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 487 (2d Cir. 2013) (finding Title VII claim arbitrable and noting that, "as a general matter, courts have consistently found that [Title VII] claims can be subject to mandatory arbitration" (alterations and internal quotation marks omitted)); *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 530 (S.D.N.Y. 2003) ("Anticipatory or pre-dispute arbitrat[ion] agreements . . . have repeatedly been enforced to compel arbitration of employment discrimination claims under not just Title VII but also the NYHRL."); *Stewart v. Paul, Hastings, Janofsky & Walker, LLP*, 201 F. Supp. 2d 291, 294 (S.D.N.Y. 2002) (granting motion to compel arbitration of an ADA claim where plaintiff did not demonstrate that the arbitration agreement was unenforceable).

*trial of the action* until such arbitration has been had in accordance with the terms of the

agreement." (emphasis added)).[8]

### B. Attorneys' Fees

Defendants further request that the Court award them attorneys' fees "in connection with

the filing of this [M]otion" because, according to them, "Plaintiff has irrationally and

inexplicably refused to abide by her contractual obligations to arbitrate" despite "[being] given

multiple opportunities . . . by Defendants . . . [and] by this Court[] to fulfill her agreement to

arbitrate." (Mem. 18.)  It is true, as Defendants note, that the Court "may, pursuant to its

inherent equitable powers, assess attorneys' fees and costs when a party has 'acted in bad faith,

vexatiously, wantonly, or for oppressive reasons.'" *First Nat'l Supermarkets, Inc. v. Retail,*

*Wholesale & Chain Store Food Emps. Union Local 338*, 118 F.3d 892, 898 (2d Cir. 1997)

(quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)).  But the Court disagrees with

---

[8] The Court rejects Defendants' request that it dismiss the case instead of staying it.  (*See* Mem. 15–16.)  Defendants cite a number of cases in this circuit recognizing that dismissal is appropriate despite the FAA's clear command that courts "shall . . . stay the trial of the action." 9 U.S.C. § 3; *see, e.g.*, *Bimota SPA v. Rousseau*, 628 F. Supp. 2d 500, 506 (S.D.N.Y. 2009) ("[A]ll courts of which we are aware have followed the rule that, where all of the issues raised in the Complaint must be submitted to arbitration, the [c]ourt may dismiss an action rather than stay proceedings." (some alterations and internal quotation marks omitted)); *Nayal*, 620 F. Supp. 2d at 574 (same).  The Second Circuit has not expressly held that dismissal is appropriate under 9 U.S.C. § 3, but in *Salim Oleochemicals v. M/V SHROPSHIRE*, 278 F.3d 90 (2d Cir. 2002), it intimated that dismissal might be allowed.  *Id.* at 93 (recognizing a district court's ability to "decid[e] whether to dismiss an action or instead to grant a stay" in certain circumstances). However, the court in that case also instructed district courts to "be aware that dismissal renders an order appealable under [9 U.S.C.] § 16(a)(3), while the granting of a stay is an unappealable interlocutory order under § 16(b)," and that "[u]nnecessary delay of the arbitral process through appellate review is disfavored" in light of "the pro-arbitration tilt of the [FAA]." *Id.* (internal quotation marks omitted).  Given this language disfavoring appellate review of orders compelling arbitration, and given the FAA's clear language *mandating* that district courts stay an action rather than dismiss it, this Court opts to stay this case pending the outcome of the arbitration.

Defendants' characterization of Plaintiff's refusal to arbitrate as "irrational[] and inexplicabl[e]," and, as is clear from this Opinion, Defendants are incorrect that Plaintiff "has provided *no* case law supporting her position" and that "Plaintiff has *no basis* in law or equity to support" what Defendants inaccurately claim is a "patently frivolous argument."  (Mem. 18 (emphasis added).)  Notably, after Plaintiff filed an Opposition Memorandum of Law articulating her position, Defendants did not appear to press their specific request for fees in their Reply Memorandum of Law, even while maintaining that Plaintiff "is grasping at straws, making arguments that do not apply to these facts, relying on clearly distinguishable law and . . . fabricating stories that are literally impossible to have occurred."  (*See* Reply 5.)  The Court therefore denies Defendants' Motion for Attorneys' Fees.  *See Josie-Delerme v. Am. Gen. Fin. Corp.*, No. 08-CV-3166, 2009 WL 2366591, at *5 (E.D.N.Y. July 31, 2009) (granting motion to compel arbitration but denying motion for attorneys' fees even while agreeing that the plaintiff's "claims regarding the validity and applicability of the [arbitration agreement were] without merit" and that "her response to [the] defendants' motion was cursory"); *Tri-Built Const., Inc. v. N.Y.C. Dist. Council of Carpenters Pension Fund*, No. 05-CV-0694, 2005 WL 1265865, at *3 (S.D.N.Y. May 17, 2005) (granting motion to compel arbitration but denying motion for attorneys' fees); *Austin Nichols & Co. v. Wine, Liquor & Distillery Workers' Union, Local No. 1*, No. 80-CV-2063, 1980 WL 2154, at *3 (S.D.N.Y. Nov. 12, 1980) (granting motion to compel arbitration but denying motion for attorneys' fees based on a finding "that plaintiff's claim had some legal and factual support and was therefore colorable" (internal quotation marks omitted)); *cf. Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, No. 10-CV-1853, 2011 WL 1002439, at *3 (S.D.N.Y. Mar. 16, 2011) ("In cases

involving unfounded opposition to petitions to compel arbitration, courts have awarded attorneys' fees where the party refusing arbitration acted without justification or did not have a reasonable chance to prevail." (internal quotation marks omitted)).

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion To Compel Arbitration, but it denies their Motion for Attorneys' Fees.  The case will remain stayed pending arbitration. The Clerk of Court is respectfully requested to terminate the pending Motion.  (*See* Dkt. No. 35.)

SO ORDERED.

DATED:      March **31** , 2014
                    White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE